# SUPREME COURT

OF THE

## STATE OF MISSOURI

### APRIL TERM, 1908.

*(Continued from Volume 211.)*

McCULLY et al., BOARD OF RAILROAD AND WAREHOUSE COMMISSIONERS, v. CHICAGO, BURLINGTON, & QUINCY RAILWAY COMPANY, Appellant.

### In Banc, May 13, 1908.

1. **RAILROAD: Franchise: Right to Charge Fares.** The right of a railroad company to charge and collect fares or tolls for transportation of persons or property over its lines of railroad is the essence of its franchise, and to trench upon that right would be to deprive it of its property without due process of law, and to deny to it the equal protection of the laws.

2. **———: Uniformity of Rates: Exceptions: Equal Protection and Due Process of Law.** The Legislature has the power to fix the maximum rates which railroad companies may charge for the transportation of persons or property, provided such rates be just and reasonable to both carrier and the public; but it cannot enact a law making maximum rates, and then proceed to make exceptions to it in favor of such persons or classes as in the legislative judgment or caprice may seem proper. It cannot fix a maximum rate for carrying live stock by the carload, and then require the carrier, in consideration of that rate, to furnish, without any further consideration or service rendered, free return transportation to the shipper to the place from which the shipment was made.

   *Held*, by WOODSON, J., dissenting, that, in the absence of a showing that such maximum rate is not sufficient com-

212 Sup.–1         (1)

pensation for carrying both the live stock and the shipper, the provisions of the Federal and the State Constitutions in reference to equal protection of the laws and due process of law have nothing to do with the case; that is not a question of discrimination, but the question is whether or not the maximum rate is confiscatory, and if defendant does not make a showing that it is, there is no question of a denial of the equal protection of the laws in the case.

3. ——: ——: **Shipper's Free Fare: Law Unconstitutional.** Where the Legislature has fixed a maximum rate for the transportation of live stock by the carload, it cannot subsequently by a separate law, in consideration of the payment of such fixed rate, require the carrier to furnish, free of charge, return transportation to the shipper or his employee to the place from which the shipment is made, without providing that such free transportation shall be furnished in consideration of something of value to the carrier, such as the accompanying of the stock by the shipper or the employee and assisting in caring for and looking after them.    Such free transportation is a gratuity, and a discrimination in favor of the shipper of live stock by the carload, and against the shippers of other classes of freight, and such legislation is a violation of the Fourteenth Amendment which prohibits a State from enacting laws which deny to its citizens the equal protection of the laws.

*Held*, by **WOODSON, J.,** dissenting, that the court cannot assume as a matter of fact that the maximum rates prescribed by the statute for shipping live stock were insufficient compensation for the shipment of the stock and for the passage of the shipper.   But in the absence of a showing that the shipment of the stock and the shipper both ways entailed a loss on the railroad company, not only in the particular shipment, but in the entire business of the company, or, in other words, that the maximum rate fixed by the statute was not a reasonable and just charge for the shipment of the stock and the shipper both ways, there is no denial of the equal protection of the laws, and no ground for holding unconstitutional the statute prescribing free "shippers' tickets."

*Held*, also, first, that if the maximum rate is a full and fair compensation for carrying both stock and shipper, then the company does not carry the shipper free and there is no denial of the equal protection of the laws; and, second, conceding such shipper is carried free, and that thereby a discrimination is made against other shippers, that is not a discrimination in favor of one railroad company against another, and is not a matter that concerns defendant railroad, and it cannot raise that question, for it does not belong to the class of such other shippers.

Appeal from Linn Circuit Court.—*Hon. Jno. P. Butler,*
Judge.

REVERSED.

*O. M. Spencer* and *A. W. Mullins* for appellant.

Section 1085, Revised .Statutes 1899, upon which
the suit is based, is unconstitutional and void. Rail-
road v. Campbell, 61 Kan. 439; Railroad v. Smith, 173
U. S. 684; State v. Loomis, 115 Mo. 307; State v. Julow,
129 Mo. 168. The State has power by legislation to fix
maximum rates of charges for railroad companies for
the transportation of persons and property, but such
rates must be just and reasonable to the carrier and
the public. The Legislature cannot, however, "enact
a law making maximum rates, and then proceed to
make exceptions to it in favor of such persons or classes
as in the legislative judgment or caprice may seem
proper." Railroad v. Smith, 173 U. S. 695. The
right to charge and collect tolls for the transportation
of persons and property over their lines, conferred
upon and vested in railroad companies by their char-
ters, is an important property right and essential to
them to do business, and a denial of this right would
necessarily and effectually destroy the value of the
other property owned by them.

*Herbert S. Hadley,* Attorney-General, and *John
Kennish,* Assistant Attorney-General, for respondents.

Section 1085, Revised Statutes 1899, is a valid and
constitutional statute, and the court did not err in over-
ruling defendant's demurrer to the petition. The ques-
tion presented by this appeal was decided by the Su-
preme Court of this State in the recent case of George
v. Railroad, not reported. From the act itself, it appears
that the only maximum freight rate involved in this
case is the rate on live stock in carload lots, and that

the carrier is not required to render the service of transporting the shipper or his employee free, as contended by the appellant, but that the carrier receives as its compensation for such service a part of the consideration paid for the car. Assuming that said section 1085 was not intended to and does not relieve the carrier of the care theretofore required of it in the shipment of live stock, it is, in effect, merely a reduction of the maximum rate on class H, in that it imposes on the carrier an additional service, while the rates prescribed remain as before. In defining this act it is not necessary to show that the carrier was relieved from the duty of caring for the stock in transit in consideration of this additional service, as suggested in the Kansas case cited in appellant's brief. If the maximum rate fixed by said section 1194 for class H, including the transportation of the shipper or his employee, as provided in said section 1085, is a reasonable rate for the full service thus rendered by the carrier, it is submitted that the carrier has no valid complaint on the ground that the act is violative of its rights in that it operates to deprive the carrier of its property without due process of law. Appellant assumes that, because the maximum rate was not increased to an amount equal to the fare of the shipper when the act under consideration was passed, therefore, the carrier was required to render this additional service without compensation. Doubtless the General Assembly could have reduced the maximum rate on live stock provided in said section 1194, to the amount of the fare of the shipper, leaving the latter to pay his fare each way, which would have been no better for the carrier, nor worse for the shipper. The Act of 1899, as well as the Act of 1887, of which the former was amendatory, clearly impose upon the carrier in the shipment of live stock additional burdens without a corresponding increase of the maximum rate, but it does not follow that either act is un-

constitutional for that reason. The Legislature has the undoubted power to fix reasonable rates, and to provide regulations for the shipment of freight, and it is expressly provided by said section 1085 that the consideration paid for the car by the shipper shall include compensation to the carrier for passing the shipper. Whether or not the rate allowed by said section 1194 for the transportation of live stock in carload lots, including the service required by the Act of 1887, and by said section 1085, is sufficient compensation for the service rendered by the carrier, is a question of fact to be determined upon evidence, and not a question of law to be determined by a demurrer to the petition.

*O. M. Spencer, A. W. Mullins* and *H. J. Nelson* for appellant in reply.

Respondents argue that the maximum rate the carriers are allowed by law to charge for transportation of live stock includes compensation for the carriage of the shipper to market with the live stock and back to shipping point. This theory is a mere assumption without any basis in fact. The law fixing the maximum freight rate on live stock does not and never has contained any reference whatever to the transportation of the shipper free with the stock, and if the Legislature, in fixing the maximum rate, ever intended that the carrier should perform passenger service for freight compensation, or any service whatever in addition to the simple carriage of the live stock and the performance of the duty cast upon it by the common law (and still remaining upon it) to care for the stock, then certainly the Legislature would so have expressed itself. Counsel for respondents argue that the subsequent enactment of section 1085 "is in effect merely a reduction of the maximum rate on Class H (live stock in carloads) in that it imposes on the carrier an additional service, while the rates prescribed remain as

before." If that be true, then section 1085 is clearly unconstitutional because it is a reduction of a maximum rate by an indirect and round-about way,—a method which the Supreme Court of the United States, in Railroad v. Smith, 173 U. S. 684, positively states cannot be lawfully followed by a Legislature. Counsel for respondents argue that the Legislature might, at the time of enactment of section 1085, have reduced the maximum freight rate on live stock to an amount equal to "the fare of the shipper, leaving the latter to pay his fare each way, which would have been no better for the carrier nor worse for the shipper." Of course, it would have been no worse for the shipper, because the shipper who did not care to go with his stock would have secured the transportation of his stock to market cheaper, but it would have been far better for the carrier, because the Legislature, to be consistent, would have had to provide that when the shipper did not assume the duty of caring for the stock in transit and going along with it, then the carrier might charge the old rate instead of the reduced rate, thereby giving to the carrier some compensation for the additional duties cast upon it to care for the stock and enabling the carrier to protect itself against the numerous abuses of the free transportation to live stock shippers. Those abuses are the principal cause of the refusal of the carriers to grant return transportation to shippers on one car of live stock and of their adherence to the regulations they had found it necessary to prescribe for the conduct of their business in order to minimize the abuses and frauds practiced upon the carriers. The fact that section 1085 renders the carriers helpless to protect themselves against such frauds and abuses is one of the reasons why they have refused to obey said section to the letter and are asking this court to hold said section unconstitutional.

BURGESS, J.—This proceeding was instituted in the circuit court of Linn county by plaintiffs, in their official capacity as members of the Board of Railroad and Warehouse Commissioners, against the defendant, under section 1150, Revised Statutes 1899.

It is provided by section 1085, Revised Statutes 1899, that in case of the shipment of live stock by the carload, railroad companies shall pass the shipper or his employee to and from the point designated in the contract or bill of lading, in consideration of the price paid for the car, and without further expense to the shipper. Informal complaints having been made to the Board of Railroad and Warehouse Commissioners that the defendant railway company was refusing to furnish shippers of live stock by the carload with return transportation, a hearing was had before said board, due notice having been given to defendant, after which hearing an order was made by the board directing the defendant to pass the shipper of live stock, or his employee, to and from the place designated in the contract, or bill of lading, as provided in said section 1085. The order thus made was duly served upon the defendant, and upon its refusal to comply therewith this suit was instituted by plaintiffs to enjoin the defendant from violating the order of the board and the provisions of said section 1085.

The defendant demurred to the petition upon the following grounds:

"1. Because said petition does not state facts sufficient to constitute a cause of action.

"2. Because section 1085 of the Revised Statutes of Missouri, 1899, upon which plaintiffs' complaint is founded and their said petition predicated, is invalid and void, because it is repugnant to and in conflict with the 14th Amendment to the Constitution of the United States in this, that said statute operates as a deprivation of property without due process of law, and is a

denial of the equal protection of the laws, in denying to railroad companies the right to charge and exact the payment of tolls or fares for the transportation of persons over their lines.

"3.   Because said section of the statutes undertakes to require railroad companies, as common carriers, to render valuable service without compensation."

The demurrer was overruled by the court, and the defendant declining to plead further, final judgment was rendered as prayed for in the petition, from which judgment defendant appealed to this court.

It is insisted by defendant that the court below erred in overruling the demurrer interposed by it to the petition, and in rendering judgment against the defendant and in favor of plaintiffs, because section 1085, Revised Statutes 1899, upon which the complaint is predicated, is repugnant to and in conflict with the 14th Amendment to the Constitution of the United States, and, therefore, void.

The statute in question is as follows:

"Section 1085.   Whenever any railroad company or corporation doing business within the limits of this State shall receive and ship any live stock, or watermelons when shipped with the privilege of peddling along the line of said road or roads, by the carload, said company shall, in consideration of the price paid for said car, pass the shipper or his employee to and from said point designated in contract or bill of lading without further expense to shippers, under penalties as in the two preceding sections: *Provided*, that this section shall not be so construed as to permit a shipper of live stock to peddle the same along the line of said road or roads."

This section of the statute was enacted in 1889, and approved June 12th of that year.   [Laws 1889, p.

63.] The headnotes or catch-words to the act and the title thereto are as follows:

"CORPORATIONS: RAILROADS — SHIPPERS TO RIDE FREE, WHEN.

"*An act to amend an act to require railroad companies, or persons owning or operating any railroad or railroads in this State, to furnish suitable and convenient cars for shipping live stock, and transporting and delivering the same to consignees at any station or stockyard in this State, approved March 31, 1887, by adding a new section thereto.*

"Section 1. *Company to pass shippers,*" etc.

The Legislature of this State, in 1875, enacted for the first time a statute fixing the maximum rates authorized to be charged by railroad companies for the shipment of live stock in carloads within this State. These rates were "not exceeding ten dollars per carload for the first twenty-five miles, and not exceeding seven dollars per carload for the second twenty-five miles, and four dollars per carload for each additional twenty-five miles, or fractional part thereof, unless the fraction be less than thirteen miles, in which case the rate shall not exceed two dollars per carload for such fractional part." [Laws 1875, p. 114.] This statute was brought forward and incorporated, without amendment, into the revisions of 1879, 1889 and 1899, being section 1194, Revised Statutes 1899. Railroad companies were thus limited in the charges they might make for shipping live stock when the act of 1889 was passed, now section 1085, Revised Statutes 1899. Prior to the said act of 1889 there was no statute requiring railroad companies to furnish shippers of live stock or their employees free transportation.

While it is conceded by defendant that the Legislature has the power to fix the maximum rates which railroad companies may charge for the transportation of persons and property, provided such rates be just

and reasonable to both the carrier and the public, it insists that the Legislature cannot "enact a law making maximum rates, and then proceed to make exceptions to it in favor of such persons or classes as in the legislative judgment or caprice may seem proper," citing Railroad v. Smith, 173 U. S. 695.

The right of the defendant to charge and collect fares or tolls for the transportation of persons and property over its line is the essence of its franchise, and to trench upon this right would be to deprive it of its property without due process of law, and to deny to it the equal protection of the law.

The said 14th Amendment to the Constitution of the United States, among other things, provides that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Railroad v. Campbell, 61 Kan. 439, was an action against the railway company to recover a sum of money paid as passenger fare on the lines of the road of the company from Kansas City, Kansas, to Attica, Kansas. The plaintiff in the case shipped a carload of live stock from the latter place to the former. On the going trip he rode free on a stock shipper's contract issued to him by the railroad company's agent at the shipping point, and on the return trip demanded to be carried free, in accordance with the provisions of chapter 167, Laws of 1897, of said State. This demand was refused, and to avoid ejection from the train he paid the required fare. He then brought action to recover the amount paid, together with an attorney's fee for the prosecution of the suit. Judgment was rendered in his favor, first, by a justice of the peace, next, by the district court, and lastly by the court of appeals. The

railroad company prosecuted error to the Supreme Court. The only question involved in the case was the constitutionality of the enactment under which the demand for free transportation was made, the title of the act and the only section necessary to refer to in this case being as follows:

"An Act to amend chapter 195, of the Laws of 1895, being an act entitled 'An act to require railroad companies to furnish free transportation to shippers of stock in certain cases, and providing a remedy in case of failure or refusal on the part of the railroad company to comply with the provisions of this act;' to provide a penalty for the violations of the provisions of this act, and repealing all acts and parts of acts in conflict herewith.

"Section 1. That section 1 of chapter 195, of the Laws of 1895, be amended so as to read as follows:

"Section 1. Whenever any railroad company, or corporation, doing business within the limits of this State shall receive and ship any live stock by the carload, said company, in consideration of the usual price paid for the shipment of said car, shall pass the shipper or his employee to and from the point designated in the contract or bill of lading, without further expense to the shipper in the way of fare: *Provided, however,* that in all cases where a shipper ships more than one carload of stock at the same time the said railroad company shall be and is hereby required to pass free, as aforesaid, only one additional person, shipper, or employee, for every three carloads shipped in addition to the first carload."

It was held by the court that said act, in requiring railroad companies to furnish free transportation to shippers of live stock in certain cases, was a deprivation of property without due process of law, and a denial of the equal protection of the laws, and, therefore,

unconstitutional and void under the Fourteenth Amendment to the Federal Constitution:

The court said: "The property of a railroad company consists not alone in its franchise to be a corpora-· tion, nor its right of way and track, nor its rolling-stock and other tangible property, but it consists, in its most essential character and important sense, in the right to charge and collect tolls for the transportation of persons and property over its line. Without the right to take tolls such corporation could not do business, and a denial of its right to take tolls would as effectually render valueless all of its other property as a confiscation of its other property would defeat its ability to carry on its business. Upon the conception of the right to take tolls as a species of property belonging to railroad corporations rest all the decisions of all the courts, both State and Federal, denying the right of State Legislatures to restrict such tolls below a reasonable amount. It needs but a glance at the act in question, and but a moment's thought over the consequences to result from a sanction of its provisions, to perceive that it strikes vitally at the fundamental right of a railroad company to own and enjoy that species of property which exists in the form of its franchise to charge and collect tolls. It purports in its title to be, and is, 'An act to require railroad companies to furnish free transportation to shippers of stock in certain cases,' and in its body it requires railroad companies, 'in consideration of the usual price paid for the shipment of a car of stock, to pass the shipper or his employee to and from the point designated in the contract or bill of lading, without further expenses to the shipper in the way of fare.' Upon no theory whatever, consistent with the idea that the franchise of railroad companies to take tolls is a species of property, or consistent with the adjudications of the courts that such right of property is protected by the Fourteenth Amend-·

ment to the Federal Constitution, can such an enactment be upheld. Once grant that so much of the property of railroad companies as is involved in their right to charge passenger fare to shippers of stock can be taken away by legislative enactment, and it necessarily follows that the like property of theirs which consists in their right to charge passenger fare to other shippers of other kinds of property can also be taken away for like reasons; and once grant, upon like considerations, that the property right of railroad companies to take tolls for passenger carriage can be thus taken away, and the right to take tolls for freight transportation can be likewise taken away; and once grant that the right to take tolls for freight and passenger carriage can be taken away, and it follows that the right to own and possess the rolling-stock and other like property necessary to the operation of the road can be likewise taken away; in short, there would be no end to the extention of legislative authority over the right of railroad companies to own and enjoy property.''

Railroad v. Smith, 173 U. S. 684, involved the validity of an act of the Legislature of Michigan requiring railroad companies to keep for sale 1000-mile tickets at specified rates, less than the regular rates, to be issued in the name of the purchaser and the members of his family, and to be good for use for two years from the date of sale. The court said: ''If the Legislature can interfere by directing the sale of tickets at less than the generally established rate, it can compel the company to carry certain persons or classes free. If the maximum rates are too high in the judgment of the Legislature, it may lower them, provided it does not make them unreasonably low as that term is understood in the law; but it cannot enact a law making maximum rates, and then proceed to make exceptions to it in favor of such persons or classes as in the legislative judgment or caprice may seem proper. What

right has the Legislature to take from the company the compensation it would otherwise receive for the use of its property in transporting an individual or classes of persons over its road, and compel it to transport them free or for a less sum than is provided for by the general law? Does not such an act, if enforced, take the property of the company without due process of law? We are convinced that the Legislature cannot thus interfere with the conduct of the affairs of corporations."

The statute in question does not mention any consideration for the free transportation to the stock-shipper, or his employee, to the point of destination and return, other than "the price paid for said car," such price or compensation for said car being prescribed and limited by section 1194, Revised Statutes 1899.

If the purpose of the Legislature, in requiring the railroad company to give free transportation to the shipper of live stock, or his employee, was to enable the shipper or his employee, free of charge, to accompany and care for the stock, the statute does not so state; nor does it impose upon the shipper the duty of caring for the stock, such duty now, as always, resting upon the carrier, and if he neglects it, and by reason of such neglect the stock be injured, the carrier will be responsible to the shipper in damages, although the shipper be on the same train with the stock at the time such injury occurs. The statute does not require the shipper to accompany the stock, and if the intention of the Legislature in enacting such law was that the shipper should accompany and care for the stock, it should so have provided, and, in consideration of the free transportation to the shipper, have to some extent absolved the carrier from the duty and responsibility of caring for the stock now resting upon it.

Since it cannot be assumed that the usual price paid per car for the shipment of live stock is excessive

to the extent of one passenger fare to and from the point designated in the bill of lading, the free transportation must be regarded as a gratuity, or rather a discrimination in favor of the shipper of live stock by the carload, as against the shipper of other classes of freight, by the carload, and as such it is as unjust to the latter as it is to the railroad company. It is clear that such legislation is "so inherently unreasonable as to constitute a violation of the due process and equal protection clauses of the 14th Amendment." [Railroad v. North Carolina Corp. Com., 206 U. S. 1.] In that case it is said: "Let it also be conceded that a like repugnancy to the Constitution of the United States would arise from an order made in the exercise of the power to fix a rate when the result of the enforcement of such order would be to compel a carrier to serve, for a wholly inadequate consideration, a class or classes selected for legislative favor, even if, considering rates as a whole, a reasonable return from the operation of its road might be received by the carrier."

Plaintiffs contend that the only maximum freight rate involved in this case is the rate on live stock in carload lots, and that the carrier is not required to render the service of transporting the shipper or his employee free, but that the carrier receives as its compensation for such service a part of the consideration paid for the car. We are unable to see the force of this argument. The law fixing the maximum freight rates on live stock contains no provision whatever for the transportation of the shipper free with the stock, and it cannot be that, if the Legislature, in fixing the maximum rate, intended that the carrier should perform passenger service to be paid for in the transportation of the stock, it would not so provide in the act.

It is also said by plaintiffs that the subsequent enactment of section 1085, supra, "is in effect merely á reduction of the maximum rate on Class H [live stock

in carloads] in that it imposes on the carrier an additional service, while the rates prescribed remain as before.'' This is virtually admitting the unconstitutionality of the law, as already indicated. Besides, there is nothing disclosed by the record to justify such contention.

From the foregoing conclusions it results that said section 1085, in so far as it requires railroad companies to furnish, free of charge, return transportation to shippers of stock by carload over the line of their road or roads to the point from which shipment is made, is in violation of the 14th Amendment to the Constitution of the United States, and void, because it deprives the carrier of its property without due process of law, and is a denial of the equal protection of the law in that it denies railroad companies the right to charge and exact payment of tolls or fares for the transportation of shippers of stock over their lines which they are 'allowed to charge other shippers for the same kind of service.

Our conclusion is that the judgment should be reversed and the proceedings dismissed. It is so ordered. *Gantt, C. J., Valliant, Fox,. and Graves, JJ.,* concur; *Lamm, J.,* in the result. *Woodson, J.,* dissents.

## DISSENTING OPINION.

WOODSON, J.—With due respect for the learned opinion of my associates handed down in this case, I am unable to concur therein for the following reasons:

I. It is disclosed by the petition in this case, and it is admitted by the demurrer filed herein, that the appellant is a foreign railroad corporation, and was on October 31st, 1901, duly licensed and authorized to do business in this State. The constitutionality of the Act of 1889 (Laws 1889, p. 63), commonly called the "Drover's Pass Act," now section 1085, Revised Stat-

utes 1899, is assailed because, as it is contended, said section violates section 30 of article 2 of the Constitution of Missouri, and section 1 of the XIVth Amendment of the Federal Constitution, which, in substance, provide that no person shall be deprived of life, liberty or property without due process of law, and that no State shall make or enforce any law which denies to any person the equal protection of the law.

If this statute does not deprive appellant of its property without due procees of law, and if it does not deny it the equal protection of the law, then it is obnoxious to neither of said constitutional provisions.

We will consider those two propositions in the order stated.

Said section 1085, in so far as it is material to the issues of this case, reads as follows: ''Whenever any railroad company or corporation doing business within the limits of this State shall receive and ship any live stock . . . . by the carload, said company shall, in consideration of the price paid for said car, pass the shipper or his employee to and from said point designated in the contract or bill of lading without further expense to shippers, under penalties as in the two preceding sections.''

It will not be denied that the right of the appellant to collect fares or tolls for the transportation of persons and property over its line of roads is of the essence of its franchise and license to do business in this State, and to unreasonable entrench upon that right would deprive it of its property without due process of law, which is prohibited by the constitutional provisions before mentioned.

This brings us to the consideration of the proposition, does this statute deprive appellant of its property without due process of law? It has not been, and cannot be logically contended, that the Legislature is with-

out power to prescribe maximum rates which railroad companies may charge for the transportation of persons and property within the limits of the State, or that it may not in its judgment raise or lower those rates, provided they do not make them so unreasonably low as to amount to a confiscation of the company's property rights. [Railroad v. Smith, 173 U. S. l. c. 687, 694.]

That being unquestionably true, then, in my judgment, those fundamental provisions have nothing whatever to do with the question now under consideration, in the absence of a showing that the maximum rates fixed by section 1194, Revised Statutes 1899, for the transportation of live stock is not sufficient compensation for carrying both the live stock and the shipper thereof. In other words, if the maximum rates fixed by that section of the statute is a reasonable and fair compensation for carrying both the live stock and the shipper, then there is nothing in the State or Federal Constitution which prohibits the Legislature from enacting such a statute as the one in question. The object of those fundamentals was to prevent the Legislature from enacting laws which amount to confiscation of property, which include the rights of railroad corporations to charge fair and reasonable tolls for services performed by it in the transportation of persons and property.

Suppose the Legislature had made an investigation and had found and stated in terms that the maximum rates fixed by the statute for carrying live stock were too high, and that those charged were not only fair and reasonable for transporting live stock but that they were also sufficient to pay a reasonable compensation for the passage of the shipper to and from the point of shipment, then could it be seriously contended that the Legislature would be prohibited by those constitutional provisions from reducing those charges in a sum

equal to what would be a reasonable charge for carrying the shipper to the place of the shipment and return? · I think not. If that can be done without offending against those constitutional inhibitions, then by parity of reasoning I am unable to see how it can be logically contended that the Legislature, in the exercise of its police powers, may not make the same reduction of rate charges by requiring the company to carry the shipper also to and from the market at the same maximum rates previously fixed for transporting the live stock alone, provided, as before stated, those rates constitute reasonable compensation for the carriage of both the stock and the shipper. To illustrate, suppose the maximum rate fixed by statute for transporting a car of live stock from Trenton to St. Joseph is extortionate and unreasonably high—say five dollars a car—and suppose that five dollars would be a reasonable charge for carrying the shipper from Trenton to St. Joseph and return, then, if the Legislature has the power to reduce the maximum rates in the sum of five dollars a car, which it is conceded it has the power to do, I ask, in the name of reason, why may not the Legislature require the company to carry the stock and the shipper to the point of destination and carry the latter back, all in consideration of the maximum rates so established? If those rates will pay a fair compensation for the transportation of both the stock and the shipper, then I am unable to see in what manner the company is injured or deprived of its property by the statute requiring it to carry both for the maximum rate. What possible difference can it make to the company whether a lump sum be paid to it for carrying both the stock and the shipper, or whether only a part of the same sum be paid to it for shipping the stock and the balance thereof be paid to it for the transportation of the shipper? Absolutely none, I insist, for the reason that the company performs precisely the same

service and receives therefor the same compensation. This principle is recognized and laid down in the case of Railroad v. Minnesota, 186 U. S. l. c. 267, and Railroad v. North Carolina Corp. Com., 206 U. S. 1.

The only authority cited by counsel for appellant which it is contended militates against the conclusion above stated is the case of Railroad v. Smith, 173 U. S. 684. The facts of that case were substantially as follows: In the year 1891 the Legislature of the State of Michigan amended the general railroad law of the State, a portion of the ninth section of which amendment reads as follows:

"Provided, further, That one-thousand-mile tickets shall be kept for sale at the principal ticket office of all railroad companies in this State or carrying on business partly within and partly without the limits of the State, at a price not exceeding twenty dollars in the Lower Peninsula and twenty-five dollars in the Upper Peninsula. Such one-thousand-mile tickets may be made non-transferable, but whenever required by the purchaser they shall be issued in the names of the purchaser, his wife and children, designating the name of each on such ticket, and in case such ticket is presented by any other than the person or persons named thereon, the conductor may take it up and collect fare, and thereupon such one-thousand-mile ticket shall be forfeited to the railroad company. Each one-thousand-mile ticket shall be valid for two years only after date of purchase, and in case it is not wholly used within the time, the company issuing the same shall redeem the unused portion thereof, if presented by the purchaser for redemption within thirty days after the expiration of such time, and shall on such redemption be entitled to charge three cents per mile for the portion thereof used."

"On April 19, 1893, and again on October 17, 1893, the defendant in error demanded of the ticket agent

of the plaintiff in error, in the city of Adrian, Michigan, a thousand-mile ticket, pursuant to the provisions of the above section, in the names of himself and his wife, Emma Watts Smith, which demand was refused. The defendant in error then applied for a mandamus to the circuit court to compel the railway company to issue such ticket upon the payment of the amount of $20, and after a hearing the motion was granted. Upon *certiorari* the Supreme Court of Michigan affirmed that order and held that the statute applied only to the railway lines of the plaintiff in error operated within the State of Michigan.

"The defense set up by the railway company was that under the charter from the State to one of the predecessors of the company to whose rights it had succeeded, it had the right to charge three cents a mile for the transportation of all passengers, and that such charter constituted a contract between the State and the company, which the former had no right to impair by any legislative action, and that the statute compelling the company to sell thousand-mile tickets at the rate of two cents a mile was an impairment of the contract, and was therefore void as in violation of the Constitution of the United States. It also alleged that the act was in violation of the Fourteenth Amendment of the Constitution of the United States, in that it deprived the company of its property and liberty of contract without due process of law, and also deprived it of equal protection of the laws. The act was also alleged to be in violation of the Constitution of the State of Michigan on several grounds.

"The Supreme Court of the State decided that there was no contract in relation to the rates which the company might charge for the transportation of passengers, and that the statute violated no provision of the Federal or the State Constitution, but was a valid enactment of the Legislature, and therefore the court

affirmed the order for mandamus, the ticket to be good upon and limited to the railway lines of the defendant railroad company within the State of Michigan. [Smith v. Railroad, 72 N. W. 328.]''

The company then sued out a writ of error from the Supreme Court of the United States. The only parts of the decision bearing upon the questions involved in this case are as follows:

''The only subject of inquiry for us in this case is whether the act of the Legislature of the State of Michigan violates any provision of the Federal Constitution. It is not within our province to review the decision of the Supreme Court upon the question whether the act violates the Constitution of the State.

''The two questions of a Federal nature that are raised in the record are, (1) whether the act violates the Constitution of the United States by impairing the obligation of any contract between the State and the railroad company; and (2) if not, does it nevertheless violate the Fourteenth Amendment of the Constitution by depriving the company of its property or liberty without due process of law or by depriving it of the equal protection of the laws. If we should decide that this act violates any provision of the Fourteenth Amendment it would be unnecessary to examine the question whether there was any contract between the State and the company as claimed by it. We will therefore first come to an investigation of the legislative authority with reference to that amendment.

''If unhampered by contract there is no doubt of the power of the State to provide by legislation for maximum rates of charges for railroad companies, subject to the condition that they must be such as will admit of the carrier earning a compensation that under all the circumstances shall be just to it and to the public, and whether they are or not is a judicial question. If the rates are fixed at an insufficient amount within

the meaning of that term as given by the courts, the law would be invalid, as amounting to the taking of the property of the company without due process of law. [Railroad v. Wellman, 143 U. S. 339, 344; Reagan v. Farmers' Loan & Trust Company, 154 U. S. 362, 399; Railroad v. Gill, 156 U. S. 649; Smyth v. Ames, 169 U. S. 466, 523.]  .  .  .  .

"The police power is a general term used to express the particular right of a government which is inherent in every sovereignty. As stated by Mr. Chief Justice TANEY, in the course of his opinion in the License cases, 5 How. 504, 583, in describing the powers of a State: 'They are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions. And whether a state passes a quarantine law, or a law to punish offenses, or to establish courts of justice, or requiring certain instruments to be recorded, or to regulate commerce within its own limits, in every case it exercises the same power; that is to say, the power of sovereignty, the power to govern men and things within the limits of its dominion.'

"This power must, however, be exercised in subordination to the provisions of the Federal Constitution. If, in the assumed exercise of its police power, the Legislature of a State directly and plainly violates a provision of the Constitution of the United States, such legislation would be void.

"The validity of this act is rested by the counsel for the defendant in error upon the proposition that the State Legislature has the power of regulation over the corporation created by it, and in cases of railroad corporation, the same power of regulation and also full control over the subject of rates to be charged by them as carriers for the transportation of persons and property.  .  .  .

"The question is presented in this case whether

the Legislature of a State, having power to fix maximum rates and charges for the transportation of persons and property by railroad companies, with the limitations above stated, and having power to alter, amend or repeal their charters, within certain limitations, has also the right, after having fixed a maximum rate for the transportation of passengers, to still further regulate their affairs and to discriminate and make an exception in favor of certain persons, and give to them a right of transportation for a less sum than the general rate provided by law.

"It is said that the power to create this exception is included in the greater power to fix rates generally; that having the right to establish maximum rates, it therefore has the power to lower those rates in certain cases and in favor of certain individuals, while maintaining them or permitting them to be maintained at a higher rate in all other cases. It is asserted also that this is only a proper and reasonable regulation.

"It does not seem to us that this claim is well founded. We cannot regard this exceptional legislation as the exercise of a lesser right which is included in the greater one to fix by statute maximum rates for railroad companies. The latter is a power to make a general rule applicable in all cases and without discrimination in favor of or against any individual. It is the power to declare a general law upon the subject of rates beyond which the company cannot go, but within which it is at liberty to conduct its work in such a manner as may seem to it best suited for its prosperity and success. This is a very different power from that exercised in the passage of this statute. The act is not a general law upon the subject of rates, establishing maximum rates which the company can in no case violate. The Legislature having established such maximum as a general law now assumes to interfere with the management of the company while con-

ducting its affairs pursuant to and obeying the statute regulating rates and charges, and notwithstanding such rates it assumes to provide for a discrimination, an exception in favor of those who may desire and are able to purchase tickets at what might be called wholesale rates—a discrimination which operates in favor of the wholesale buyer, leaving the others subject to the general rule. And it assumes to regulate the time in which the tickets purchased shall be valid and to lengthen it to double the period the railroad company has ever before provided. It thus invades the general right of a company to conduct and manage its own affairs, and compels it to give the use of its property for less than the general rate to those who come within the provisions of the statute, and to that extent it would seem that the statute takes the property of the company without due process of law. We speak of the general right of the company to conduct and manage its own affairs; but at the same time it is to be understood that the company is subject to the unquestioned jurisdiction of the Legislature in the exercise of its power to provide for the safety, the health and the convenience of the public, and to prevent improper exactions or extortionate charges from being made by the company.

"It is stated upon the part of the defendant in error that the act is a mere regulation of the public business, which the Legislature has a right to regulate, and its apparent object is to promote the convenience of persons having occasion to travel on railroads and to reduce for them the cost of transportation; that its benefit to the public who are compelled to patronize railroads is unquestioned; that it brings the reduction of rates of two cents per mile within the reach of all persons who may have occasion to make only infrequent trips; and that there is no reason why the Legislature may not fix the period of time within which the

holder of a ticket shall be compelled to use it. The reduction of rates in favor of those purchasing this kind of a ticket is thus justified by the reasons stated. . . .

"The power of the Legislature to enact general laws regarding a company and its affairs does not include the power to compel it to make an exception in favor of some particular class in the community and to carry the members of that class at a less sum than it has the right to charge for those who are not fortunate enough to be members thereof. This is not reasonable regulation. We do not deny the right of the Legislature to make all proper rules and regulations for the general conduct of the affairs of the company, relating to the running of trains, the keeping of ticket offices open and providing for the proper accommodation of the public.

"This act is not like one establishing certain hours in the day during which trains shall be run for a less charge than during the other hours. In such case it is the establishing of maximum rates of fare for the whole public during those hours, and it is not a discrimination in favor of certain persons by which they can obtain lower rates by purchasing a certain number of tickets by reason of which the company is compelled to carry them at the reduced rate, and thus, in substance, to part with its property at a less sum than it would be otherwise entitled to charge. The power to compel the company to carry persons under the circumstances as provided for in this act, for less than the usual rates, does not seem to be based upon any reason which has hitherto been regarded as sufficient to authorize an interference with the corporation, although a common carrier and a railroad.

"The act also compels the company to carry not only those who choose to purchase these tickets, but their wives and children, and it makes the tickets good

McCully v. Railroad.

for two years from the time of the purchase. If the Legislature can, under the guise of regulation, provide that these tickets shall be good for two years, why can it not provide that they shall be good for five or ten or even a longer term of years? It may be said that the regulation must provide for a reasonable term. But what is reasonable under these circumstances? Upon what basis is the reasonable character of the period to be judged? If two years would and five years would not be reasonable, why not? And if five years would be reasonable, why not ten? If the power exists at all, what are the factors which make it unreasonable to say that the tickets shall be valid for five or for ten years? It may be said that circumstances can change within that time. That is true, but circumstances may change within two just as well as within five or ten years. There is no particular time in regard to which it may be said in advance and as a legal conclusion that circumstances will not change. And can the validity of the regulation be made to depend upon what may happen in the future, during the running of the time in which the Legislature has decreed the company shall carry the purchaser of the ticket? Regulations for maximum rates for present transportation of persons or property bear no resemblance to those which assume to provide for the purchase of tickets in quantities at a lower than the general rate, and to provide that they shall be good for years to come. This is not fixing maximum rates, nor is it proper regulation. It is an illegal and unjustifiable interference with the rights of the company.

"If this power exists it must include the right of the Legislature, after establishing maximum freight rates, to also direct the company to charge less for carrying freight where the party offering it sends a certain amount, and to carry it at that rate for the next two or five or ten years. Is that an exercise of

the power to establish maximum freight rates? Is it a valid exercise of the power to regulate the affairs of a corporation? The Legislature would thus permit not only discrimination in favor of the larger freighter as against the smaller one, but it would compel it. If the general power exist, then the Legislature can direct the company to charge smaller rates for clergymen or doctors, for lawyers or farmers or school teachers, for excursions, for church conventions, political conventions, or for all or any of the various bodies that might desire to ride at any particular time or to any particular place.

"If the Legislature can interfere by directing the sale of tickets at less than the generally established rate, it can compel the company to carry certain persons or classes free. If the maximum rates are too high in the judgment of the Legislature, it may lower them, provided they do not make them unreasonably low as that term is understood in the law; but it cannot enact a law making maximum rates, and then proceed to make exceptions to it in favor of such persons or classes as in the legislative judgment or caprice may seem proper. What right has the Legislature to take from the company the compensation it would otherwise receive for the use of its property in transporting an individual or classes of persons over its road, and compel it to transport them free or for a less sum than is provided for by the general law? Does not such an act, if enforced, take the property of the company without due process of law? We are convinced that the Legislature cannot thus interfere with the conduct of the affairs of corporations.

"But it may be said that as the Legislature would have the power to reduce the maximum charges for all, to the same rate at which it provides for the purchase of the thousand-mile ticket, the company cannot be harmed or its property taken without due process of

law when the Legislature only reduced the rates in favor of a few instead of in favor of all. It does not appear that the Legislature would have any right to make such an alteration. To do so might involve a reduction of rates to a point insufficient for the earning of the amount of remuneration to which a company is legally entitled under the decisions of this court. In that case reduction would be illegal. For the purpose of upholding this discriminatory legislation we are not to assume that the exercise of the power of the Legislature to make in this instance a reduction of rates as to all would be legal, and therefore a partial reduction must be also legal. Prima-facie, the maximum rates as fixed by the Legislature are reasonable. This of course applies to rates actually fixed by that body.

"There is no presumption, however, that certain named rates which it is said the Legislature might fix but which it has not, would, in case it did so fix them, be reasonable and valid. That it has not so fixed them affords a presumption that they would be invalid, and that presumption would remain until the Legislature actually enacted the reduction. At any rate, there is no foundation for a presumption of validity in case it did so enact, in order to base the argument that a partial reduction, by means of this discrimination, is therefore also valid. And this argument also loses sight of the distinction we made above between the two cases of a general establishment of maximum rates and the enactment of discriminatory, exceptional and partial legislation upon the subject of the sale of tickets to individuals willing and able to purchase a quantity at any one time. The latter is not an exercise of the power to establish maximum rates.

"True it is that the railroad company exercises a public franchise and that its occupation is of a public nature, and the public therefore has a certain interest

in and rights connected with the property, as was held in Munn v. Illinois, 94 U. S. 113, 125, and the other kindred cases. The Legislature has the power to secure to the public the services of the corporation for reasonable compensation, so that the public shall be exempted from unreasonable exactions, and it has also the authority to pass such laws as shall tend to secure the safety, convenience, comfort and health of its patrons and of the public with regard to the railroad. But in all this we find it neither necessary nor appropriate, in order that the Legislature may exercise its full right over these corporations, to make such a regulation as this, which discriminates against it and in favor of certain individuals, without any reasonable basis therefor, and which is not the fixing of maximum rates or the exercise of any such power.

"The Legislature having fixed a maximum rate at what must be presumed, prima-facie, to be also a reasonable rate, we think the company then has the right to insist that all persons shall be compelled to pay alike, that no discrimination against it in favor of certain classes of married men or familes, excursionists or others, shall be made by the Legislature. If otherwise, then the company is compelled at the caprice or whim of the Legislature to make such exceptions as it may think proper and to carry the excepted persons at less than the usual and legal rates, and thus to part in their favor with its property without that compensation to which it is entitled from all others, and therefore to part with its property without due process of law. The affairs of the company are in this way taken out of its own management, not by any general law applicable to all, but by a discrimination made by law to which the company is made subject. Whether an act of this nature shall be passed or not, is not a matter of policy to be decided by the Legislature. It is a matter of right of the company to carry on and manage

its concerns subject to the general law · applicable to all, which the Legislature may enact in the legal exercise of its power to legislate in regard to persons and things within its jurisdiction.

"This case differs from that which has just been decided, Railroad v. Ohio, 173 U. S. 285. In that case the convenience of the public in the State was the basis of the decision, regard being also had to the convenience of the public outside of and beyond the State. It included all the public who desired to ride from the stations provided for in the act, and the convenience to the people in taking a train at these stations was held by this court to be so substantial as to justify the enactment in question."

From a careful reading of that case it is clear that the conclusions therein reached are not in conflict with anything herein stated, and are foreign to the questions involved in this case.

There is nothing contained in section 1085 which interferes in any manner with the management of the company while conducting its affairs pursuant to and obedient to the general statutes regarding rates and charges for the transportation of freight and passengers over its road, nor does it attempt to regulate its passenger business or the time in which tickets purchased shall be valid, transferable or redeemable, nor does it discriminate in favor of one class of persons who are engaged in the shipment of live stock and against another class engaged in like business, as did the Michigan statute, which was under review in that case. No such questions are involved in this case. The statute under review does not discriminate in favor of a large or heavy shipper of live stock and against the small shipper by giving the former a better or a lower rate than it gives the latter. Under this statute both must pay the same rates, and are entitled to receive the same service.

While there may be some loose or unguarded expressions in that opinion, if considered abstractly and not in connection with the facts of the case, which give color to the argument of counsel and, for the ruling of this court in the opinion filed herein, but when viewed and considered in the light of the facts involved in that case, it fades away and leaves neither substance nor color for the argument of counsel or the holding of this court upon which to stand.

That I have correctly interpreted that case is made plain by the holding of the same court in the case of Railroad v. Minnesota, 186 U. S. 1. c. 268, where the following language is used: "Notwithstanding the evidence of the defendant that, if the rates upon all merchandise were fixed at the amount imposed by the Commission upon coal in carload lots, the road would not pay its operating expenses, it might well be that the existing rates upon other merchandise, which are not disturbed by the Commission, may be sufficient to earn a large profit to the company, though it may earn little or nothing upon coal in carload lots;" citing Smyth v. Ames, 169 U. S. 466.

Under the law as thus stated, it necessarily becomes a question of evidence whether the rates fixed are reasonable compensation for the conveniences and services rendered to the public.

If we take into consideration, which it is our duty to do, the character of this class of freight, the laws and customs regarding such shipments that existed prior to the enactment of this statute, it is thereby made perfectly plain that the Legislature wished thereby to make that which was up to that time in a measure optional, yet almost universal in practice, a legal duty on the part of railroad companies to carry shippers of live stock to and from the place of shipment for the same charges and considerations which had there-

tofore been paid to and received by them for said services.

It was common knowledge among those who were at all familiar with stock-raising and stock-shipping and with other common affairs of life, which includes courts and legislatures, that it was almost a universal custom for railroads to issue to the shipper of one or more cars of live stock what is commonly called a "shipper's pass" or a "shipper's ticket," entitling him to accompany the stock to market, or other place of shipment, in order that he might look after and care for the stock.

The main object and purpose of the company in issuing the pass, and of the shipper in receiving it, was to induce and enable the owner of the stock to accompany and properly care for the stock, and not for the purpose of relieving the company of any duty imposed upon it by law as a common carrier; but was more for the purpose of enabling the shipper to protect the stock from injuries and risks assumed by him, and for which the company was not liable at common law; such as result from the crowded condition of the stock in the cars, from their excitement, fears, viciousness, exhaustion, hunger and thirst during their transportation, and also from the jars and concussions attending the starting and stopping of the train, without negligence, and to see that the stock was otherwise humanely treated, as far as it was possible to do so under the circumstances.

These were the things which interested the shipper principally, and they were the considerations which induced him to accompany the shipments. He did not go with the stock for the purpose of relieving the company from any of its legal obligations to him, growing out of their relation of carrier and shipper— that was the farthest from his intentions; nor did the

212 Sup—3

company issue to him the so-called free transportation in consideration that he would so release it from those obligations; but for the purpose of having him perform the duties it owed to the State, imposed by police regulations, which require railroads, as well as all others who have in their charge live stock, to treat it humanely. If the company violated any of the legal duties it owed to the shipper which resulted in damages to him, he had his action at law to recover those damages; but if the company violated any of the duties it owed to the State, by virtue of the police regulation, he had no cause of action against the company on that account, but it was subject to criminal prosecution therefor.

I might also add in this connection that the laws of this State will not permit railroad companies to restrict their liability so as to exempt them from liability for loss or damages occasioned by their negligence. [Levering v. Railroad, 42 Mo. 88; Oxley v. Railroad, 65 Mo. 629; Stanard Milling Co. v. Railroad, 122 Mo. 258.]

But waiving the question as to what was the motive or purpose of the company in issuing the shipper's pass and his object in accepting it, and let that object and purpose be whatever they may have been, yet the fact still remains that the Legislature and every one else knew the fact, that live stock was being continuously neglected and injured while being shipped to market when not accompanied by the owner or by some one representing him; and in order to relieve that situation as much as possible and to prevent further injury and suffering, the Legislature in the wise and proper exercise of the police power of the State enacted section 1085, the statute complained of.

The object of the statute is humane in its tendency—that will not be disputed; nor can it be seriously contended that, if enforced, it would cost the appellant one cent more to carry the shipper under the stat-

ute than it costs to carry him under the custom before mentioned, which prevailed before the statute was enacted. But concede that it would cost more, and also concede that at times the appellant did not issue free passes to shippers, and that upon some or all of those occasions he paid fare both ways, yet under the facts of this case and in the absence of a showing to the contrary, we must presume, especially in the light of the almost universal custom of the railroad companies in issuing free transportation, that the Legislature intended and found that the one fare fixed by the statute was sufficient and reasonable to pay for the transportation of the stock, and also that of the shipper, both ways.

In other words, the Legislature treated the entire matter as one transaction, and prescribed one fare, which, in its judgment, was a reasonable sum to fully pay for the entire service rendered in the transportation of the stock and the shipper.

Apropos to the foregoing remarks are the suggestions of GRANT, J., in the case of Heller v. Railroad, 109 Mich. 53, and as that case so fully and clearly discusses that question and the rights and duties of the parties existing under such custom, I feel justified in making extended quotations therefrom. That was a suit brought by the plaintiff against the defendant to recover damages to live stock, caused by the alleged negligence of the defendant in not shipping the stock according to contract. In discussing that question GRANT, J., said:

"It is of importance to state what grounds of negligence are set forth in the declaration. They are as follows: (1) Delay in transit; (2) failure to feed, water and properly care for them; (3) in keeping them in the car from 7 o'clock on March 14th until 7 o'clock on March 16th, without food, water, care, or opportunity to lie down, and without adequate protec-

tion from the cold; (4) placing them in the car in a cramped and uncomfortable position.

"The declaration in summing up the cause of the injury, states that it was 'occasioned by the delay, and by said cold, and want of food, water, care, and room.'

"Upon these allegations, or some of them, must rest the plaintiff's right of recovery.

"We will first note those which must be eliminated: (a) Plaintiff suffered nothing by delay, and did not upon the trial, and does not now ask, recovery upon that basis. (b) The cattle were not kept in the car, as charged, but were removed and fed and watered within the time required by the interstate commerce law of the United States. [Rev. St. U. S. 1878, sec. 4386.] They were properly watered and fed. Those in charge of the cattle at Bancroft so testified. There is no evidence to the contrary, and nothing to impeach the witnesses.

"(c) He cannot recover for want of room. If the car was overloaded, this was his own fault. Plaintiff conceded this, and claimed that the car was not overloaded. The court properly instructed the jury that, if overloading was the cause of the injury, plaintiff could not recover.

"(d) Defendant was not responsible for any injury from the cold weather, nor was there any evidence that the cattle suffered from the cold.

"There is, therefore, left only the question whether the defendant performed its duty in properly caring for the animals, for want of care is the only basis upon which a recovery can be had. It is not alleged or claimed that there was negligence in the management of the train. This brings us to the important questions: What risks did plaintiff assume? And what duty did defendant owe to plaintiff in the care of the property committed to it for transportation? The

court instructed the jury that the defendant was not liable as a common carrier. Such has been the rule in this State for the last 25 years. [Railroad v. Mc-Donough, 21 Mich. 165.] The able opinion in that case was written by the late Mr. Justice CHRISTIANCY, and is exhaustive in both its reasoning and the authorities cited. While it is usually sufficient to refer to the authority, yet the reason there given is so cogent and forcible in its application to this case that I am constrained to quote parts of it: 'Animals have wants of their own to be supplied; and this is a mode of conveyance at which, from their nature and habits, most animals instinctively revolt; and cattle especially, crowded in a dense mass, frightened by the noise of the engine, the rattling, jolting and frequent concussions of the cars, in their frenzy, injure each other by trampling, plunging, goring, or throwing down; and, frequently, on long routes, their strength becomes exhausted by hunger and thirst, fatigue, and fright, the weak easily fall and are trampled upon, and unless helped up, must soon die. Hogs, also, swelter and perish. It is a mode of transportation which, but for its necessity, would be *gross cruelty, and indictable as such.* The risk may be greatly lessened by care and vigilance, by feeding and watering at proper intervals, by getting up those that are down, and otherwise. But this imposes a degree of care and an amount of labor so different from what is required in reference to other kinds of property that I do not think this kind of property falls within the reasons upon which the common law liability of common carriers was fixed.'

"The court, further, in discussing what these carriers would naturally do if they were common carriers, or held themselves out as such, said that 'they [the carriers] must employ a corps of men skilled in the care and management of stock, a business quite foreign in its character from that of operating a railroad, and

McCully v. Railroad.

that they must make many other provisions to guard against injury and risk which are not required for other property generally transported by railroads.

" 'Now, we must shut our eyes to what is notorious to all business men, or we must take judicial notice, as I think we are bound to do, that this is not the mode, and such are not the principles, upon which this great and rapidly increasing business of transporting live stock to an Eastern market is generally, if at all, done upon the railroads of this State (if, in fact, in any other of the Western States). I think we are also bound to know that, if this business were done in this mode and upon these principles, and could be done in no other way, and the railroads were to be held responsible as insurers for all damage not caused by the act of God or the public enemies (which is strictly the common-law liability), or by the viciousness of some particular animal or animals in the mass, which would be a ludicrous distinction applied to a carload of cattle, or for all such as might be prevented by human agency, the railroad companies, to indemnify themselves against such risks and the extraordinary expenses of this mode of doing the business, must, of course, demand a much higher freight; and, if they can be compelled to carry at all in this way, they must provide themselves with all the conveniences I have mentioned, and keep on hand a special corps of experienced stockmen; and, being compelled to keep them, and having gone to the expense of the necessary conveniences, it would then be for their interest to charge the higher freight in all classes, and refuse to carry upon any other terms. And, in this manner, those who would prefer to take the care and risk upon themselves for a lower freight would be deprived of the opportunity. The law of common carriers is founded mainly upon considerations of public policy, and these considerations, therefore, should not be overlooked. On

the other hand, if the drover, with a sufficient force of his own men, experienced in the proper management of the cattle, goes upon the same train free of charge, in a drover's car, provided for that purpose, and has the entire charge, care, and management of the cattle, and the responsibility for care and injury incident to that mode of transportation, the company only furnishing the proper cars and motive power, and being responsible only for their sufficiency, and the proper mode of making up and running the train, it is manifest there will be much less liability to injury or loss, and that the companies can afford to carry the cattle at greatly reduced rates. This, undoubtedly, is the mode, substantially, in which this branch of business is carried on generally upon the railroads of this State, and probably other Western States, so far as relates to the transportation of cattle to an Eastern market— sometimes by special contract, setting forth the terms, as in a bill of lading, receipt, or ticket, and sometimes only by the uniform course of business as adopted by the company, and acted upon by their employers.'

"Plaintiff assumed all the ordinary risks of transportation, and all injury which resulted from the cramped and crowded condition of the cattle, from their restiveness, viciousness, exhaustion, hunger, and thirst during their transportation, and also from the jars and concussions incident to starting and stopping the train. The defendant owed the duty to transport the car and its contents with ordinary prudence, skill and care, and with reasonable dispatch. It was understood, and was a part of the contract, that the car was to be transferred within the usual time of from 24 to 32 hours, and that the defendant was under no obligation to unload, water, and feed the cattle if transported within that time. Upon ascertaining that plaintiff had no one in charge of the cattle, it would undoubtedly have been the duty of the defendant to un-

load and water and feed them when, from any cause, it was unable to transport and deliver them within the usual time. The defendant, upon ascertaining the condition of the cattle (whether because the conductor found that he could not deliver them within the usual time, or not, is immaterial), unloaded and took care of the cattle in a proper manner. In doing this it performed its entire duty towards the plaintiff.

"The court instructed the jury that the custom of the shipper to send a care-taker was universal, that it was established beyond controversy, that it applied to this case, that it became a part of the contract, and that plaintiff was bound by it. The court failed to instruct the jury as to the effect of this custom. The plaintiff assumed all those risks and injuries resulting from his failure to comply with this custom to send a care-taker. One of the principal reasons why some one should be employed to keep constant watch of animals, while in these cars, is that it is dangerous for one to lie down. It is therefore necessary that all be kept standing, and, if one gets down, that he should be gotten up as soon as possible. The danger from one lying down is apparent. He is apt to be trampled upon, his flesh bruised and bones broken. . . . The plaintiff not only did not send such a care-keeper, but he did not request the defendant to assume such care, did not notify it that he was sending no care-taker, nor request its agents in charge of the train to exercise any supervision or care over them. He therefore assumed all the risks from the failure upon his part to comply with the custom. This custom was recognized by this court as early as 1867. [McMillan v. Railroad, 16 Mich. 109.] The conductor and brakemen of this train had other constant and important duties to perform in its management. To impose upon them the additional duty of looking after 24 cars of live stock and to see that the animals were kept in proper condi-

tion and position, would be unreasonable, and not a duty assumed by this defendant. The *rates of transportation are fixed with a view to the universal custom that the shipper must perform this duty, if he desires it to be performed, or make a special contract with the carrier to do so.* [Kimball v. Railroad, 26 Vt. 258.] Now, it is evident that such a care-taker could have watched these cattle, and prevented this injury, whether they were overloaded or not. For this neglect the plaintiff alone is responsible, and it bars his recovery. In German v. Railroad, 38 Iowa 127, the defendant was held liable because it shipped some of the plaintiff's cars without notice to him, and thus prevented him from accompanying them as he intended. The defendant was properly held liable for not taking the care which the owner would have taken, had he not been prevented from accompanying the train.''

These authorities hold that, even in the absence of statutory requirements, it was the duty of railroad companies to issue the shipper's pass, and that it was the correlative duty of the shipper to accept the same and accompany the stock, and that if he failed to do so, then he was not entitled to recover damages for injuries sustained by them which were incident to the transportation of that class of freight. Those cases also hold rates to be charged for the transportation of live stock are fixed in view of those mutual rights and obligations of the parties to the contract of shipment, even though the contract was an implied one, and based upon custom alone. If that was the law governing the carrier and the shipper, fixed by universal custom, then stronger should the reason be for holding a statute valid which is merely confirmatory of that custom.

In principle, however, I do not go to the same extreme length that my associates do in this case. In their opinion they hold that it is the absolute duty

of the railroad company to carry the shipper of the stock to the point of its destination free of charge, and that too regardless of the question as to whether or not the maximum rates fixed by statute would pay a reasonable fare for both the stock and the shipper. While I do not go to that extent, but only hold that the road may be compelled to carry the shipper both ways where the maximum rates are sufficient to pay for the transportation of both, yet I am not prepared to say they are not right in going that far. The only doubt I entertain upon that proposition is the power of the Legislature to compel the company to carry a person who is not its agent or employee free of charge to perform a duty required of it by a police regulation.

That the company is required to treat the stock humanely while under its charge and control will not be denied, and that it may be legally required to hire and carry its own employees to perform those duties and care for the stock regardless of the cost and expense thereof is equally unquestionable; for the reason that in the absence of some express constitutional prohibition, whenever the Legislature enacts a law tending to promote the public health, public morals, the public safety, or other matters pertaining to the public welfare, all of those who are embraced within its terms must obey its mandate whether they be individuals or corporations, public or private, and the question of the costs and expense attending its obedience is wholly immaterial, and the rule is not changed by the fact that the duty required to be performed is for the benefit and good of the public. This is illustrated by the ordinances which require the individual to keep clean the street in front of his premises by requiring the snow, ice and other obstructions to be removed from the sidewalk, and by the charter provisions requiring cities to keep their streets in reasonably safe condition for travel over them, etc., and the laws requiring railroad

companies to keep flagmen at certain public crossings, and which require them to keep a man on the farthest end of the train from the engine while in motion, and to cut weeds from their right of ways, etc. Upon this same power rests the authority of the State to regulate or prohibit the manufacture and sale of intoxicating liquors, and the humane laws have their origin in and spring from this same source.

The latter imposes the duty upon individuals and corporations to treat man and beast humanely while in their care or under their control; and, as before stated, the question of cost, expense or damage, however great, attending the performance of those duties, or incident to the obedience of such laws, is no excuse whatever for disobeying their mandate. It may bankrupt individuals and corporations, or devastate great estates, as was done by the prohibition law of the State of Kansas (Mugler v. Kansas, 123 U. S. 653), yet the law turns a deaf ear to all such excuses that may be offered and is as inexorable as were the laws of the Medes and Persians. Not only that, the police power of the State cannot be parted with. It cannot be surrendered or abolished by contract or statute. [Sec. 5, art. 12, of the Constitution of 1875.] It is an inherent element of sovereignty, and is subject only to such limitations as are written in the State and Federal Constitutions.

The latest and most exhaustive opinion upon this subject is that of Mr. Justice WHITE in the case of Railroad v. North Carolina Corporation Commission, 206 U. S. 1. In that case the main question decided was the power of that State to require the plaintiff to operate a certain train over one of its lines from Rocky Mount to Selma, in the State of North Carolina, where the evidence disclosed the fact that the daily cost of its operation was $40, and that the total daily receipts therefrom were $25, or a net loss to the company of $15 per day. In disposing of this question, the court said:

"It is contended that however otherwise just and reasonable the order may have been, it is inherently unjust and unreasonable because of the nature of the burden which it necessarily imposes.

"This proposition is based on the hypothesis that the order, by necessary intendment, directed the Coast Line to operate an additional train, although such train could not be operated without a daily pecuniary loss. The premise upon which this proposition rests would seem to be irrelevant, since the court below in one aspect of its opinion treated the order of the commission as not requiring the operation of an extra train from Rocky Mount to Selma. Yet, as the facts found by the commission and which were affirmed by the court would indicate that it was considered that the operation of such train was the most direct and efficient means for making the ordered connection, and as the court considered and passed upon the duty of the railroad to comply with the order, even if to do so it became necessary to operate the extra train at a loss, we think the proposition relied upon is open and must be decided. The contention is that the fact that some loss would result from the requirement that the extra train be operated, in and of itself, conclusively establishes the unreasonableness of the order and demonstrates that to give it effect would constitute a taking of property without due process of law in violation of the Fourteenth Amendment. Conclusive support for this contention, it is insisted, is afforded by the doctrine upheld in Smyth v. Ames, 169 U. S. 466, and the cases which preceded that decision. The cases relied upon, however, only involved whether a general scheme of maximum rates imposed by state authority prevented the railroads from earning a reasonable compensation, taking into view all proper considerations as to the value of the property and the cost of operation, and, if not, whether the enforcement of rates so unreasonably low

would be unjust and unreasonable, and, therefore, be confiscation, that is, a taking of property without due process of law in violation of the Constitution of the United States. The principle upon which the cases in question proceeded was thus summed up by Mr. Justice HARLAN, delivering the opinion of the court in Smyth v. Ames, 169 U. S. 526:

" 'A State enactment or regulations made under the authority of a State enactment, establishing rates for the transportation of persons or property by railroad that will not admit of the carrier earning such compensation as, under all the circumstances, is just to it and to the public, would deprive such carrier of its property without due process of law and deny to it the equal protection of the laws, and would, therefore, be repugnant to the Fourteenth Amendment of the Constitution of the United States.'

"But this case does not involve the enforcement by a State of a general scheme of maximum rates, but only whether an exercise of State authority to compel a carrier to perform a particular and specified duty is so inherently unjust and unreasonable as to amount to the deprivation of property without due process of law or a denial of the equal protection of the laws. In a case involving the validity of an order enforcing a scheme of maximum rates of course the finding that the enforcement of such scheme will not produce an adequate return for the operation of the railroad, in and of itself demonstrates the unreasonableness of the order. Such, however, is not the case when the question is as to the validity of an order to do a particular act, the doing of which does not involve the question of the profitableness of the operation of the railroad as an entirety. The difference between the two cases is illustrated in Railroad v. Gill, 156 U. S. 649, and Railroad v. Minnesota, 186 U. S. 257. But even if the rule applicable to an entire rate scheme were to be

applied, as the findings made below as to the net earnings constrain us to conclude that adequate remuneration would result from the general operation of the rates in force, even allowing for any loss occasioned by the running of the extra train in question, it follows that the order would not be unreasonable, even if tested by the doctrine announced in Smyth v. Ames, and kindred cases.

"It is insisted that, although the case be not controlled by the doctrine of Smyth v. Ames, nevertheless, the arbitrary and unreasonable character of the order results from the fact that to execute it would require the operation of a train at a loss, even if the result of the loss so occasioned would not have the effect of reducing the aggregate net earnings below a reasonable profit. The power to fix rates, it is urged, in the nature of things, is restricted to providing for a reasonable and just rate, and not to compelling the performance of a service for such a rate as would mean the sustaining of an actual loss in doing a particular service. To hold to the contrary, it is argued, would be to admit that a regulation might extend to directing the rendering of a service gratuitously or the performance of first one service and then another and still another at a loss, which could be continued in favor of selected interests until the point was reached where by compliance with the last of such multiplied orders the sum total of the revenues of a railroad would be reduced below the point of producing a reasonable and adequate return. But these extreme suggestions have no relation to the case in hand. Let it be conceded that if a scheme of maximum rates was imposed by State authority, as a whole adequately remunerative, and yet that some of such rates were so unequal as to exceed the flexible limit of judgment which belongs to the power to fix rates, that is, transcended the limits of just classification and amounted to the creation of favored class or classes

whom the carrier was compelled to serve at a loss, to the detriment of other class or classes upon whom the burden of such loss would fall, that such legislation would be so inherently unreasonable as to constitute a violation of the due process and equal protection clauses of the Fourteenth Amendment. Let it also be conceded that a like repugnancy to the Constitution of the United States would arise from an order made in the exercise of the power to fix a rate when the result of the enforcement of such order would be to compel a carrier to serve for a wholly inadequate compensation a class or classes selected for legislative favor even if, considering rates as a whole, a reasonable return from the operation of its road might be received by the carrier. Neither of these concessions, however, can control the case in hand, since it does not directly involve any question whatever of the power to fix rates and the constitutional limitations controlling the exercise of that power, but is concerned solely with an order directing a carrier to furnish a facility which it is a part of its general duty to furnish for the public convenience. The distinction between an order relating to such a subject and an order fixing rates coming within either of the hypotheses which we have stated is apparent. This is so because as the primal duty of a carrier is to furnish adequate facilities to the public, that duty may well be compelled, although by doing so as an incident some pecuniary loss from rendering such service may result. It follows, therefore, that the mere incurring of a loss from the performance of such a duty does not in and of itself necessarily give rise to the conclusion of unreasonableness, as would be the case where the whole scheme of rates was unreasonable under the doctrine of Smyth v. Ames, or under the concessions made in the two propositions we have stated. Of course, the fact that the furnishing of a necessary facility ordered may occasion an incidental pecuniary

loss is an important criteria to be taken into view in determining the reasonableness of the order, but it is not the only one. As the duty to furnish necessary facilities is coterminous with the powers of the corporation, the obligation to discharge that duty must be considered in connection with the nature and productiveness of the corporate business as a whole, the character of the services required, and the public need for its performance.''

It is thus seen that the validity of the statute does not depend alone upon the question of loss attending a particular act, the performance of which does not involve the question of the profitableness of the operation of the railroad as one entire system. The same is true in the case at bar. Section 1085 does not involve the question of the profit and loss of the entire railroad system of appellant. In fact, there is no evidence in this record which tends to show that the enforcement of this statute would entail any loss whatever even as to the particular shipment embraced within the terms of the statute, much less that its enforcement would entail a loss upon the business of its entire system of roads, and without such showing, as held in the Carolina case, the statute cannot be violative of the Fourteenth Amendment.

As before stated, while I concede, under these plenary powers, the Legislature may, by statute, require railroad companies to employ at their own cost and expense persons to accompany and care for live stock while in transit, yet I am not at present prepared to say, as I understand the majority of the members of this court have done, that the Legislature possesses the power to compel the company to carry the shipper without pay, along with the stock, in order that he may have the opportunity of looking after and caring therefor. It should be noted that in that case he would not be an employee of the company and that it would have no

authority or control over him; and he would therefore be under no legal obligation to care for the stock as an employee of the company would be. But conceding that the law would impose that duty upon him independent of orders from the company, still he would be exercising power and control over the stock, and more or less over the train and its movements, without the consent of the company and against its objection and protest, which is not accorded to any other class of shippers. This would be a discrimination against the company, and it seems to me that it would be an unauthorized interference with the management of the trains and the business of the company by a representative of the State and not of the company. To say the least that would be a novel situation in the American law of railroads.

While upon the other hand, if we view the shipment of the stock and the passage of the shipper as one entire transaction, as the Michigan, Iowa and Vermont courts do, and as section 1085 of our statute contemplates, and that the rate fixed and paid is in full for all services performed by the company, then the objection before suggested is eliminated from the case, for in that view of the matter when the company accepts the car of stock for shipment, it, by the same act, agrees to carry the shipper and consents to his caring for the stock as a part of the contract of shipment—all in consideration of the increased rate of tolls fixed, by statute, on account of the character of the freight and the care it requires.

It might be suggested in answer to the last proposition, that such a construction placed upon the statute would be a duty imposed upon the company by statute and not by contract as suggested. I concede there is plausibility in such an argument, but unsound in my judgment, for the reason that if valid and tenable as to

that part of the contract, then by parity of reasoning the same objection would extend to and embrace the contract for shipment of the stock also, because the law is just as mandatory that the company shall transport the stock as that it shall carry the shipper; yet no one will contend that a contract of shipment is void because the law requires the company to carry the freight. By such a contract the relations of the employees in charge of the train and the shipper could be better defined and regulated than could be done by statute, and thereby prevent conflicts and friction between them in the movements and operation of the trains, which is of grave importance to both the company and the public, and at the same time does not disturb the rights and duties imposed upon each by the law governing common carriers and passengers.

But in order to maintain the validity of this statute, it is not necessary to go as far as this court has in this case, nor as far as the United States Supreme Court went in the North Carolina case; but concede, for argument's sake, that the maximum rates fixed by section 1194 are insufficient to pay reasonable compensation for the transportation of the stock, and for the round trip passage of the shipper, as provided for in section 1085, and that as a result thereof a loss would be entailed upon appellant over and above the aggregate receipts derived from all of such shipments, still it would be in no position, under the facts of this record, to urge the unconstitutionality of the statute, for the reason that the record does not disclose the fact that those losses would be sufficient in amount to so reduce the aggregate receipts of the company from all sources over its entire system as to prevent it from still paying a reasonable remuneration upon the capital invested by the company after paying all fixed and operating expenses. This was the exact question involved in the North Carolina case, and that court held

the order valid notwithstanding the record in that case showed the company sustained an actual loss of $15 a day for every day it operated the train and complied with the order; but the record in this case shows no loss, either upon the particular shipments or upon the entire business of the whole railroad system. In that regard the facts of this case present a stronger defense than did those in the case mentioned. [Railroad v. Minnesota, 186 U. S. l. c. 267.]

The opinion of the court filed herein necessarily assumes that the maximum rates so prescribed were insufficient to pay a reasonable charge for the shipment of the stock and for the passage of the shipper. While that may be true as a matter of fact, yet this court has no right to assume it to be a fact, for the obvious reason that the maximum rates so fixed may as a matter of fact be ample and sufficient compensation for carrying the stock and the shipper. Such a precedent, in my judgment, would be extremely dangerous and far reaching in its effects upon legislative enactments, and would impose upon the Legislature the duty of assigning its reasons for amending general statutes of the State, or for enacting new sections which might qualify, limit or enlarge existing laws. Such an assignment might equal or exceed in length this opinion, which, alone, would be sufficient to condemn it. The Bench and Bar may take the same view of this opinion, but nevertheless, in my judgment, said ruling is against all precedent, reason and authority, and should not be countenanced or tolerated for a moment. The question of the reasonableness of the rates is one of fact, and when fixed by statutes they should be presumed to be fair and reasonable until the contrary is made to clearly appear, as was held in the cases of Railroad v. Minnesota, and Railroad v. North Carolina Corp. Com., supra. Such an assumption also does violence to the well-known and well-grounded rule lying at the founda-

tion of all statutory construction, which is to the effect that every statute must be presumed to be constitutional and valid until the contrary plainly appears. This rule denies the authority of the court to declare a statute void, except where it manifestly infringes upon some constitutional provision. This rule is without exception and is supported by the unanimous decisions of the courts of last resort of the various States and those of the United States. [State ex rel. v. Railroad, 48 Mo. 468; Phillips v. Railroad, 86 Mo. 540; Railroad v. Shambaugh, 106 Mo. 557; Deal v. Miss. Co., 107 Mo. 464; State ex rel. v. Wofford, 121 Mo. 61; State ex rel. v. Yancy, 123 Mo. 391.]

Under the present state of the record, how can it be contended that section 1085 plainly and manifestly conflicts with the State or Federal constitutional provision previously mentioned? There is not a word of evidence in this record which tends in the remotest degree to show that the maximum rates fixed by section 1194 are not sufficient to pay a reasonable charge for the carriage of both the stock and the shipper. In the absence of such showing, the presumption must be indulged in that the Legislature investigated or knew that the rates it had previously fixed were ample and reasonable to pay for the shipment of the stock and for the passage of the shipper both ways, as prescribed by section 1085.

I am, therefore, of the opinion that said section 1085 does not deprive appellant of its property without due process of law within the meaning of the State and Federal Constitutions.

II. The second proposition presented by appellant is that section 1085 denies to it equal protection of the law, and is for that reason offensive to the XIVth Amendment of the Constitution of the United States.

I am unable to see any merit in this contention. The section by its express terms embraces all railroad

companies doing business within the limits of this State. The mere fact that it does not apply to all carriers of live stock does not render it obnoxious to that constitutional provision, for the reason that it is not the intention of that provision to prevent legislation which embraces within its terms all persons or things which naturally and reasonably belong to the same class and similarly situated, and where the statute must operate equally and uniformly upon all such persons or things of that class. [Andrus v. Ins. Assn., 168 Mo. 151; Waters-Pierce Oil Co. v. Texas, 19 Tex. Civ. App. 14; Railroad v. Mackey, 127 U. S. 209; Barbier v. Connolly, 113 U. S. 31; Railroad v. Mathews, 165 U. S. 25; Plessy v. Ferguson, 163 U. S. 550.]

Appellant also contends that section 1085 discriminates in favor of shippers of live stock, by requiring the company to carry them free, while all other shippers must pay their fare, and is for that reason unconstitutional and void. This contention is untenable for two reasons:

First: Because if what we have stated in paragraph one of this opinion is sound, then the company does not carry the shipper free; but, upon the contrary, he pays a full and fair consideration for his transportation.

Second: Because, conceding such shipper is carried free, and that the same is a discrimination against the shippers of other kinds of freight, yet that is not a matter that concerns the railroad company except as stated in the next clause. That is not a discrimination in favor of one railroad company and against another, but it is a discrimination between shippers who ship stock over the railroads. The appellant cannot raise that question.

In 8 Cyc. 791, it is said: "The denial of equal rights and privileges by discriminating legislation can be pleaded only by those who can show that they be-

long to the class discriminated against,'' and in 6 Am. and Eng. Ency. Law (2 Ed.), 1090: ''Only those whose rights would be prejudiced by the enforcement of an unconstitutional law will be heard to question its validity.'' To the same effect is State ex rel. v. McIntosh, 205 Mo. 589.

As to the charge that the act is unjust to the carrier it may be said, in addition to what has already been stated upon the subject, as stated in the case of Railroad v. Minnesota, 186 U. S. l. c. 267, that ''what the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience,'' and, ''notwithstanding the evidence of the defendant that, if the rates upon all merchandise were fixed at the amount imposed by the Commission upon coal in carload lots, the road would not pay its operating expenses, it might well be that the existing rates upon other merchandise, which are not disturbed by the Commission, may be sufficient to earn a profit to the company, though it may earn little or nothing upon coal in carload lots;'' citing Smyth v. Ames, 169 U. S. 466.

Under the law as thus stated it becomes a question of evidence whether the compensation received by the company for the service rendered is adequate, and even if the compensation for a particular service considered alone was not adequate, the act would not fail by reason of that fact; but I will not discuss this question further, for the reason that I have covered the ground fully in paragraph one of this opinion.

III. The respondents insist that the appellant is precluded from assailing the constitutionality of the statute under consideration. Their contention is, that when appellant was licensed to do business in this State, the act now assailed as unconstitutional was in force and effect as a part of the laws of this State applicable to all railroad companies, and, therefore, will be ''read

into'' appellant's license as one of the conditions upon which it was admitted to enter and do business in this State. And cite the following authorities in support thereof:

Daggs v. Orient Ins. Co., 136 Mo. l. c. 398-9; State ex inf. v. Standard Oil' Co., 194 Mo. l. c. 149; Orient Ins. Co. v. Daggs, 172 U. S. l. c. 566; Phoenix Ins. Co. v. Levy, 33 S. W. 992; Railroad v. Kentucky, 183 U. S. 503; Julian v. Kansas City Star Co., 209 Mo. 35.

In the case of Daggs v. Insurance Co., supra, at page 398-9, the court said: ''Having availed itself of the privilege of doing business in this State under the restrictions of a statute which prescribed the effect of its contracts of insurance, it must be governed by the laws of this State. It must be held, upon every principle of good faith, to have assented as to such business to restrictions imposed, and to have its undertakings evidenced by policies here made complete, and enforced as a like contract by our own domestic companies would be; and it is in no position to enter upon the consideration of the power of this State to enact such laws. If the defendant did not desire to abide by our laws, it could have desisted from writing insurance on property and soliciting insurance in this State. [Insurance Co. v. Levy, 33 S. W. (Tex. Civ. App.) 992; Thwing v. Insurance Co., 111 Mass. 93.]''

In the Standard Oil case, supra, at page 149, it is said: ''In this view the law must be read into the license, and in this view it is not going too far to hold that when the Republic Oil Company of New York was granted and accepted a license to do business in Missouri, it agreed and contracted with this State that notice to appear and testify in any suit affecting that license or the right to do business thereunder, served upon its attorney of record in that case, should be deemed and taken as due notice to the corporation.''

In the Julian case, supra, at page 68, this court

said: "This section 997 was first enacted in 1855; it has been the law of this state, in that connection, continuously from that date to this; therefore, it was the law under which the defendant corporation was organized, and defendant cannot question its validity."

And in the Phoenix Insurance Company case, supra, at page 993, it is 'said: "It was not compelled to enter the State of Texas to solicit and obtain business; but when it has done so, it cannot complain that it is compelled to comply with the laws. No contract between it and the State has been impaired, for it was notified of what would be required of it, and has assented to it, and the proposition that its rights are being impaired because it cannot violate the laws of Texas is a proposition that meets with no approval by either Federal or State courts. [Queen Ins. Co. v. Jefferson Ice Co., 64 Tex. 578; Thwing v. Insurance Co., 111 Mass. 93; Paul v. Virginia, 8 Wall. 168; Philadelphia Fire Ass'n v. New York, 119 U. S. 110, 7 Sup. Ct. Rep. 108; Wall v. Society, 32 Fed. 273]."

I am not favorably impressed with the soundness of this contention of respondent. The doctrine here contended for, as I understand it, only applies where the corporation is asserting a right to do business in the State under and by authority of an act, and at the same time assails the constitutionality of the same act, or where the corporation has entered into a contract with a person relying upon the validity of the statute and that after the contract had been executed on his part the corporation would not be heard to claim the statute was unconsitutional.

While the appellant is a foreign corporation and is licensed to do business in this State, yet it was not licensed to do so by the act which it now claims to be unconstitutional; nor is it attempting to evade the obligation of an executed contract by claiming the statute is unconstitutional. It was licensed to do business in

this State under one act of the Legislature, and the act here assailed is a totally different act. The case falls fully within the ruling made by this court In Banc in the case of State ex rel. Kehr v. Turner, 210 Mo. 77. There it was held by the unanimous court that: "While the language there used [referring to the case of State v. Seebold, 192 Mo. 720] lends color and plausibility to respondents' contention, yet what is there said must be read in the light of the facts involved in that case, and when so read it is not an authority sustaining their position. In that case Seebold had applied for and received a license to keep a dramshop in the city of St. Louis, under what is known as the excise laws. Those same laws authorized the excise commissioner to revoke the license of a dramshop keeper for keeping his dramshop open on Sunday. Seebold violated said laws by keeping open on Sunday, and the excise commissioner revoked his license. Notwithstanding the revocation of his license he continued to keep a dramshop, and he was indicted therefor. Upon the trial he interposed an objection to the validity of the statute which authorized the excise commissioner to revoke his license; and, in passing upon that question, this court held that he would not be heard to complain of the constitutionality of the very act under which he procured and held his license. In other words, he would not be permitted to hold his license under the act and at the same time challenge the constitutionality of the act itself. The ruling in that case was unquestionably sound, for the reason that if the act under which Seebold procured his license was unconstitutional and void, then he, in fact, never held a valid license nor any vested rights thereto; and when the excise commissioner revoked the license he was deprived of no vested right by that act of the commissioner. He will not be heard to claim that the act was valid and sufficient to vest in him the license and the

right to conduct a dramshop, and in the same breath contend that the same act is invalid when it is sought to deprive him of that license and those rights which he has forfeited by violating the provisions of the same act. . . . . But this is not the question involved in the case at bar. In this case the relator is, under section 2993, entitled to his license whenever he complies with all of the requirements of the dramshop act. He is basing his rights to a license upon a valid and constitutional statute; and this court has heretofore held that under the showing made in this case he is entitled to it, and that the county court has no discretion in the matter.''

The same is true in the case at bar. The appellant is not assailing the constitutionality of the act which authorizes it to do business in this State, but is assailing the constitutionality of a statute which it contends deprives it of legal rights given to and vested in it by valid enactments of the Legislature. In other words, appellant's position is this: It has the right under valid statutes of the State to charge certain fixed rates for the transportation of live stock, and that respondents are attempting to reduce those rates under the authority of an unconstitutional statute by requiring it to carry the shipper of the stock also for the rates previously fixed.

I have been unable to find anything in our laws which deprives appellant of the right to interpose the unconstitutionality of the statute mentioned as a defense to this action; but I have found a provision of the Constitution of the United States which guarantees to it the same rights that the laws of this State give to her own citizens.

A domestic railroad corporation would unquestionably have the right to assail the constitutionality of section 1085. This goes without saying; and, that being true, section 1 of the Fourteenth Amendment of the

Constitution provides that: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

To permit a domestic railroad corporation (for instance, the Missouri Pacific Railway Company) to interpose the invalidity of section 1085, and deny that same right to the appellant would be a plain violation of that section of the Constitution. The cases cited by respondent are based upon estoppel and not upon the statute, and are, in my judgment, inapplicable to this case.

For the reasons herein stated I dissent from the majority opinion.