# MINNEAPOLIS & ST. LOUIS RAILROAD COMPANY *v.* MINNESOTA.

## ERROR TO THE SUPREME COURT OF THE STATE OF MINNESOTA.

No. 131. Argued January 23, 24, 1902.—Decided June 2, 1902.

The act of the Legislature of Minnesota, creating a railroad commission, is not unconstitutional in assuming to establish joint through rates or tariffs over the lines of independent connecting railroads, and apportioning and dividing the joint earnings.

Such a commission has a clear right to pass upon the reasonableness of contracts in which the public is interested, whether such contracts be made directly with the patrons of the road or for a joint action between railroads in the transportation of persons and property in which the public is indirectly concerned.

Without deciding whether or not connecting roads may be compelled to enter into contracts as between themselves, and establish joint rates, it is none the less true that where a joint tariff between two or more roads has been agreed upon, such tariff is as much within the control of the legislature as if it related to transportation over a single line.

The presumption is that the rates fixed by the Commission are reasonable, and the burden of proof is upon the railroad company to show the contrary.

A tariff fixed by the Commission for coal in carload lots is not proved to be unreasonable, by showing that if such tariff were applied to *all* freight the road would not pay its operating expenses, since it might well be that the existing rates upon other merchandise, which were not disturbed by the Commission, might be sufficient to earn a large profit to the company, though it might earn little or nothing upon coal in carload lots.

THIS was a petition for a mandamus filed in the District Court of Ramsey County by the State, upon the relation of the Railroad and Warehouse Commission, against the Minneapolis and St. Louis Railroad Company and several other railroad companies, (the first of which alone answered and sued out this writ of error,) to compel such companies to adopt and publish a joint through rate fixed by the Commission upon shipments of hard coal in carload lots, from the city of Duluth to certain points in the southern and western parts of the State of Minnesota, and to enjoin them from demanding or receiving any

greater sum for such through shipments than that fixed by the Commission.

The facts are substantially as follows : The St. Paul and Duluth Railroad Company, a corporation of the State of Minnesota, operates a line of railroad from Duluth upon Lake Superior to the cities of St. Paul and Minneapolis. Its local rate upon hard coal in carload lots from Duluth to these twin cities. was $1.25 per ton, the reasonableness of which local rate is conceded. The Minneapolis and St. Louis Railroad Company, also a corporation of the same State, operates a line of road from St. Paul and Minneapolis southerly through Hopkins, a station nine miles from Minneapolis, to Albert Lea in said State, thence still southerly to Angus in Boone County, Iowa. At Albert Lea and Angus it connects with other railroads, and by virtue of traffic arrangements has access to all the principal markets. It also owns and operates a branch line extending from a connection with its main line at Hopkins, westerly ninety-two miles to Morton, Minnesota, at which point it connects with a railroad owned and operated by the Wisconsin, Minnesota and Pacific Railroad Company, which extends westerly from Morton to Watertown in South Dakota. Winthrop is a station upon the line of the Minneapolis and St. Louis road between Hopkins and Morton, sixty miles west of Hopkins, and at the time the order of the Commission was made the Minneapolis, New Ulm and Southwestern Railroad had constructed and owned a short line of railroad extending south from Winthrop to New Ulm in Brown County. The capital stock of the last-named company was owned by the Minneapolis and St. Louis Railroad Company ; but it was nevertheless a separate and independent corporation.

Both the St. Paul and Duluth Railroad Company and the Minneapolis and St. Louis Company are fully equipped to conduct the business of common carriers, have complete track connections and transfer facilities at St. Paul and Minneapolis, and for a long time have been engaged in transporting hard coal in carload lots without change of cars from Duluth to the points upon the line of the Minneapolis and St. Louis road for a joint through rate, which had been established by the mutual agree-

ment of the companies, and which had been divided between them according to that agreement. In dividing earnings under this joint tariff, to which not only the two principal defendants were parties, but the Minneapolis, New Ulm and Southwestern Company, and the Wisconsin, Minnesota and Pacific Company were also parties, there was first set apart to the St. Paul and Duluth Company $1 per ton for transporting the hard coal from Duluth to Minneapolis, the remainder being turned over to one or more of the other three companies participating in the carriage of the coal to its destination.

On September 22, 1898, the Railroad and Warehouse Commission, having resolved to investigate the reasonableness of this joint rate, made an order upon all these railroad companies to answer as to the reasonableness of such rate. The companies duly appeared and took part in the investigation, and on January 19, 1899, the Commission made an order whereby it determined that the joint rate then in force for transporting hard coal from Duluth to the several stations west of the twin cities was unreasonable and unjust, and ordered a reduction to another rate found by the Commission, which was published and served upon the companies, as required by the state laws, but was disregarded by the railroads interested. Under the rate so fixed the St. Paul and Duluth Company was allowed $1 per ton from Duluth to Minneapolis, which was the same price previously agreed upon between the parties, the remainder to be paid to the Minneapolis and St. Louis Company, which was left to settle with the Minneapolis, New Ulm and the Southwestern and the Wisconsin, Minnesota and Pacific Companies for services rendered by those companies in the transportation of coal to points upon their respective roads. Neither of the companies filed or posted schedules of the new tariffs as required by law, and the plaintiff in error, the Minneapolis and St. Louis Railroad Company, on March 3, 1899, and six weeks *after* the Commission made its order, withdrew all tariffs on hard coal in carload lots which had been established under agreement with the Duluth road.

Whereupon this proceeding was taken in the District Court of Ramsey County to compel the railroad companies to com-

ply with the order of the Commission. After trial, judgment was rendered by that court, confirming the order of the Commission, directing the issue of a writ of mandamus as prayed; and the judgment so rendered was affirmed upon appeal by the Supreme Court of Minnesota in *State* v. *Minneapolis & St. Louis R. R. Co.*, 80 Minn. 191.

Whereupon the Minneapolis and St. Louis Railroad Company, against which the full amount of the reduction by the Commission was assessed, sued out this writ of error.

*Mr. Albert E. Clarke* for plaintiff in error.

*Mr. Thomas D. O'Brien* for defendant in error. *Mr. W. B. Douglas* and *Mr. Ira B. Mills* were on his brief.

Mr. Justice Brown delivered the opinion of the court.

This case raises two questions: (1) The constitutionality of an act of the legislature of Minnesota passed in 1895, creating a Railroad and Warehouse Commission and defining its duties, (the material portions of which are printed in the case of *Wisconsin &c. R. R. Co.* v. *Jacobson*, 179 U. S. 287,) in so far as it assumes to establish joint through rates or tariffs over the lines of independent connecting railroads, and by virtue of which it assumes to arbitrarily apportion and divide joint earnings; (2) whether the tariff fixed by the Commission is wholly inadequate and not compensatory.

1. The constitutionality of the act of 1895 is attacked upon the ground that it authorizes the railway commission of the State to compel two or more railroad companies to enter into a joint tariff, and to make and adopt a joint rate for the transportation of property over the lines of such companies, as well as to make a division and to apportion the joint earnings among the several companies interested. It is insisted that it is beyond the constitutional power of the legislature to compel companies to enter into involuntary, unreasonable and unprofitable contracts with other companies at the instance of third parties, or to fix terms and conditions upon which such contracts shall be

performed. This argument in its various applications is one which has been addressed to and considered by this court in nearly every case in which the power of the State to regulate railway charges has been called in question, and the answer made to it in those cases is equally pertinent here. Indeed, it is impossible for the State to exercise this power of regulation without interfering to some extent with the power of a railway to contract either with its customers or connecting lines. The power is one which was said in *Munn* v. *Illinois*, 94 U. S. 113, to have been customarily exercised in England from time immemorial, and in this country from its first colonization, for the regulation of ferries, common carriers, hackmen, bakers, millers, wharfingers and innkeepers; and the whole object of this class of legislation is to curtail the power to contract by limiting the exactions of those engaged in these occupations, and providing that the rendition of such services shall not raise an implied promise to pay more than a certain fixed sum. This legislation may be justified by the fact that these various occupations are necessarily to a certain extent monopolistic in their nature, and that in dealing with customers the parties do not stand upon an equality, the latter being practically compelled to submit to such terms as the former may choose to exact, unless the State shall, acting in the interest of the public, elect to interfere and prescribe a maximum of charges.

The argument for the railroad companies in this case assumes that, while the State may interfere as between the railways and their customers, the shippers of freight, it cannot do so as between the railways themselves, by fixing joint tariffs and apportioning such tariffs among the several railways interested in the transportation. The practical result of that argument is this, that if there were within a certain State five connecting roads of 100 miles each in length, which among themselves had established a joint tariff for the whole 500 miles, the State would be powerless to interfere with such tariff, though its right to do so would be unquestioned if the whole 500 miles were owned and operated by a single company. To state such a proposition is practically to answer it. Granting that a State has no right to interfere with the internal economy of a rail-

road farther than to secure the safety and comfort of passengers, as, for example, to fix the wages of employés or control its contracts for construction, or the purchase of supplies, it has a clear right to pass upon the reasonableness of contracts in which the public is interested, whether such contracts be made directly with the patrons of the road, or for a joint action in the transportation of persons or property in which the public is indirectly concerned.

There is an underlying fallacy in the argument of the railroad company in this connection, that the sum of two reasonable local rates cannot be unreasonable; and, as it is admitted that $1.25 per ton is a reasonable local rate for transporting coal from Duluth to Minneapolis over the St. Paul and Duluth road, and that the local rates for coal from Minneapolis to the designated stations westward and southward are also reasonable, it is impossible that a through rate from Duluth to the same stations which does not exceed the aggregate of these two rates can be unreasonable. We cannot assent to this proposition. The practice of railways in this country is almost universally to the contrary, and a through tariff is almost always fixed at a less sum than the aggregate of local tariffs between nearby stations upon the same road. Doubtless the fixing of a lower through tariff is dictated largely by a desire of each road to get as much mileage as possible from its patrons, as well as by an effort to meet competition over other lines doing business between the same termini; but in addition to this there is an increased cost of local business over through business in the additional fuel consumed and the increased wear upon the machinery of each train involved in stopping at every station. These facts were noticed by Mr. Justice Brewer in the opinion of the court in *Chicago &c. Railway Company* v. *Tompkins*, 176 U. S. 167, in which he makes the following observations:

"Take a single line of 100 miles, with ten stations. One train starts from one terminus with through freight and goes to the other without stop. A second train starts with freight for each intermediate station. The mileage is the same. The amount of freight hauled per mile may be the same; but the time taken by the one is greater than that taken by the other.

Additional fuel is consumed at each station where there is a stop. The wear and tear of the locomotive and cars from the increased stops and in shifting cars from the main to side tracks is greater; there are the wages of the employés at the intermediate stations, the cost of insurance, and these elements are so varying and uncertain that it would seem quite out of reach to make any accurate comparison of the relative cost. And if this is true, when there are two separate trains, it is more so when the same train carries both local and through freight."

We are bound to recognize the fact that modern commerce is largely carried on over railways owned and operated by different companies; that Congress in passing the Interstate Commerce Act assumed the power to determine the reasonableness of joint tariffs as applied to connecting lines between the several States, *Cincinnati &c. R. R. Co.* v. *Int. Com. Com.*, 162 U. S. 184, and that, if the power of the state commission were limited to the tariffs of a single road, it would be wholly inefficacious in a large number, if not in a majority, of cases— in fact, that the whole purpose of the act might be defeated. The necessities of this case do not require us to determine whether connecting roads may be compelled to enter into contracts as between themselves and establish joint rates, but so far as applied to contracts already in existence we have no doubt of the power of the State to supervise and regulate them. Such a contract for a joint rate having been in existence when the order of the Commission was made, we do not think it was affected by the subsequent withdrawal of the Minneapolis and St. Louis Company. It may, also, be said in this connection that in *Wisconsin &c. R. R. Co.* v. *Jacobson*, 179 U. S. 287, we held that, under this very act, railways in Minnesota might be compelled to make track connections at the intersections of other roads for transferring cars from the lines or tracks of one company to those of another, as well as for facilities for the interchange of cars and traffic between their respective lines. The case did not involve the right of the Commission to prescribe joint through rates for the transportation of freight between points on their respective lines, but if any inferences are to be derived from the opinion, they are in favor of such

right. See, also, *Burlington, Cedar Rapids &c. Railway* v. *Dey*, 82 Iowa, 312, 338. All that we are required to hold in this case is that, where a joint tariff between two or more roads has been agreed upon, such tariff is as much within the control of the legislature as if it related only to transportation over a single line.

2. The more difficult question is that connected with the reasonableness of the rates. The presumption is that the rates fixed by the Commission are reasonable, and the burden of proof is upon the railroad companies to show the contrary. *Dow* v. *Beidelman*, 125 U. S. 680; *Chicago &c. Ry. Co.* v. *Tompkins*, 176 U. S. 167, 173. Indeed, the act itself provides, section three, subdivision C, "the rates established by said Commission shall go into effect within ten days, . . . and from and after that time the schedule of rates so established shall be *prima facie* evidence in all the courts of this State that such through rates are reasonable for transportation of freight and cars upon the railroads over which such schedule shall have been fixed."

In fixing the through rates for hard coal in carload lots from Duluth to interior points in Minnesota, the Commission set apart to the St. Paul and Duluth Company $1 per ton of the joint tariff, and as this was the same amount which that road had received under the prior arrangement, no question is made as to its reasonableness, and no appeal was taken by that road. The remainder of the joint tariff is paid to the Minneapolis and St. Louis Company, plaintiff in error, which was left to settle with the other roads interested in the tariff.

According to the tariff fixed by agreement between the companies prior to the action of the Commission a charge was made from Duluth to Hopkins, nine miles from Minneapolis, of $1.75, of which $1 was paid to the St. Paul and Duluth road (160 miles) and the remainder, 75 cents, to the Minneapolis and St. Louis road for a transportation of nine miles. This rate was gradually increased to stations beyond Hopkins until Norwood, forty miles from Minneapolis, was reached, where it was fixed at $2.50. The same rate was retained to Boyd, 153 miles from Minneapolis. This rate of $2.50 appears to have been a purely

arbitrary one, and indicates pretty clearly, as observed, by the Supreme Court, that the defendant was either carrying coal to Boyd at a loss or was collecting too much tariff per ton on the same article transported to Norwood, although there may have been, as observed by the court, commercial conditions which made them necessary. The Commission reduced the rate to Hopkins from $1.75 to $1.32, and to Norwood from $2.50 to $1.57, gradually increasing that rate to Boyd, where it was fixed at $2.48, but two cents less than that fixed by the joint tariff theretofore agreed upon. The average rate allowed per ton per mile to the Minneapolis and St. Louis road under the tariff so fixed by the Commission was 1.115, while the old rate charged for this service was 1.784.

This rate, fixed by the Commission only upon hard coal in carload lots, was not met by any showing that at the rates fixed by the Commission there would be no profit or an insufficient profit upon the coal so transported, but by evidence that upon the hard coal received from Duluth for the year ending June 30, 1899, 2483 tons, the proportion allotted to the Minneapolis and St. Louis Company would be $3874.50, while if the Commission's rates had been in effect for the same rate this proportion would have been $2464.78, a loss of revenue for the year of $1409.72, as shown more clearly by the following table:

| | |
|---|---:|
| Total tons of hard coal received from Duluth for year ending June 30, 1899 . . . . . . . . . . | 2583 tons. |
| M. & St. L. R. R. proportion on old rate, 2583 tons @ $1.50 . . . . . . . . : . . . . . . . . . . . . . . . . . . . | $3874 50 |
| Had commissioners' rates been in effect for same period, M. & St. L. R. R. proportion would be . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2464 78 |
| Loss of revenue to M. & St. L. R. R. for year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1409 72 |

As suggested by the Supreme Court of the State, this loss seems to be a trifling one when we consider that the total freight earnings on the divisions affected by this order were over $700,000 for that fiscal year.

The principal testimony, however, was intended to show that, if the rate fixed by the Commission for coal in carload lots were applied to *all* freight, the road would not pay its operating expenses, although in making this showing the interest upon the bonded debt and the dividends were included as part of the operating expenses.  But it also appears that if the old rate upon hard coal in carload lots agreed upon by the roads were adopted as an average rate for *all* freights, the freight earnings of the road would have been largely increased.  This would indicate that the rate fixed for coal must have been above the average rate, although coal is classified as far below the average.

It is quite evident that this testimony has but a slight, if any, tendency to show that even at the rates fixed by the Commission there would not still be a reasonable profit upon coal so carried.  It was not even shown that the joint tariff fixed by the roads themselves upon coal was not disproportionately high as compared with rates upon other articles or as gauged by a proper classification.  The difficulty with defendant's case is that it made no attempt to show the cost of carrying coal in carload lots, and that even in proving that the cost of transporting *all* merchandise exceeded the rate fixed by the Commission on this coal, the interest upon bonds and dividends upon stock were included in operating expenses.  The propriety of the first is at least doubtful, the impropriety of the second is plain.  We do not intend, however, to intimate that the road is not entitled to something more than operating expenses.  It was shown that coal belongs to one of the lowest classes of freight, and this is particularly true of the coal received from Duluth at Minneapolis, which was delivered at the Minneapolis and St. Louis Company upon their tracks at Minneapolis.  Besides this, coal in carload lots was a comparatively insignificant item of the total freight carried, being but 2583 tons for an entire year.  True, it may be difficult to segregate hard coal in carload lots from all other species of freight, and determine the exact cost to the company; but upon the other hand, the Commission, in considering a proper reduction upon a certain class of freight, ought not to be embarrassed by any difficulties the

companies may experience in proving that the rates are unreasonably low. The charges for the carriage of freight of different kind are fixed at different rates according to their classification, and this difference, presumably at least, is gauged to some extent by a difference in the cost of transportation, as well as the form, size and value of the packages and the cost of handling them.

Notwithstanding the evidence of the defendant that, if the rates upon *all* merchandise were fixed at the amount imposed by the Commission upon coal in carload lots, the road would not pay its operating expenses, it may well be that the existing rates upon other merchandise, which are not disturbed by the Commission, may be sufficient to earn a large profit to the company, though it may earn little or nothing upon coal in carload lots. In *Smyth* v. *Ames*, 169 U. S. 466, we expressed the opinion (page 541) that the reasonableness or unreasonableness of rates prescribed by a State for the transportation of persons or property wholly within its limits, must be determined without reference to the interstate business done by the carrier, or the profits derived from it, but it by no means follows that the companies are entitled to earn the same percentage of profits upon all classes of freight carried. It often happens that, to meet competition from other roads at particular points, the companies themselves fix a disproportionately low rate upon certain classes of freight consigned to these points. The right to permit this to be done is expressly reserved to the Interstate Commerce Commission by section 4 of that act, notwithstanding the general provisions of the long and short haul clause, and has repeatedly been sanctioned by decisions of this court. While we never have decided that the Commission may compel such reductions, we do not think it beyond the power of the state commission to reduce the freight upon a particular article, provided the companies are able to earn a fair profit upon their entire business, and that the burden is upon them to impeach the action of the Commission in this particular. As we said in *Smyth* v. *Ames*, (page 547,) " What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is

entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth." The very fact that the Commission, while fixing the rate to Boyd at $2.48, within two cents of the amount theretofore charged by the companies themselves, gradually reduced that rate in proportion to the mileage, to Norwood, where it was fixed at $1.57, while the company charged an arbitrary rate of $2.50 to Norwood, and to all the stations between Norwood and Boyd, tends, at least, to show that the rates were fixed upon a more reasonable principle than that applied by the companies.

In exercising its power of supervising such rates the Commission is not bound to reduce the rates upon *all* classes of freight, which may perhaps be reasonable, except as applied to a particular article; and if, upon examining the tariffs of a certain road, the Commission is of opinion that the rate upon a particular article, or class of freight, is disproportionately or unreasonably high, it may reduce such rate, notwithstanding that it may be impossible for the company to determine with mathematical accuracy the cost of transportation of that particular article as distinguished from all others. Obviously such a reduction could not be shown to be unreasonable simply by proving that, if applied to all classes of freight, it would result in an unreasonably low rate. It sometimes happens that, for purposes of ultimate profit and of building up a future trade, railways carry both freight and passengers at a positive loss; and while it may not be within the power of the Commission to compel such a tariff, it would not upon the other hand be claimed that the railroads could in all cases be allowed to charge grossly exorbitant rates as compared with rates paid upon other roads, in order to pay dividends to stockholders. Each case must be determined by its own considerations, and while the rule stated in *Smyth* v. *Ames* is undoubtedly sound as a general proposition that the railways are entitled to a fair return upon the capital invested, it might not justify them in charging an exorbitant mileage in order to pay operating expenses, if the conditions of the country did not permit it.

It is sufficient, however, for the purpose of this case to say

that the action of the Commission in fixing the rate complained of as to this particular class of freight has not been shown to be so unjust or unreasonable as to amount to a taking of property without due process of law, and we therefore conclude that the judgment of the Supreme Court must be

*Affirmed.*