LEHIGH VALLEY R. CO. v. UNITED STATES (INTERSTATE COM-
MERCE COMMISSION et al., Interveners).

(Commerce Court. April 25, 1913.)

No. 70.

1. CARRIERS (§ 34*)—FIXING OF RATE BY INTERSTATE COMMERCE COMMISSION—
REVIEW OF ORDER—PRESUMPTION.

It is individual rates or joint rates or charges which may. be inves-
tigated by the Interstate Commerce Commission, and not primarily sys-
tems of rates; and although, in determining whether an individual rate
is reasonable, the Commission may consider all matters pertaining to the
condition and management of the carrier, including other rates in force,
when the carrier seeks to review a finding that a rate is unreasonable,
and an order for its reduction, on the ground that the effect of the or-
der will be to reduce the revenues of the company below the point which
will give it a fair return, it is not aided by a presumption in favor of the
reasonableness of the many other rates not under direct investigation
which will overthrow substantial evidence that the individual rate in
question is unreasonable in itself; but the burden rests on the carrier
to prove that its rates, other than the one involved in the order, are rea-
sonably high, and cannot be advanced; otherwise, the courts cannot in-
terfere with the judgment of the Commission.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 91–93; Dec.
Dig. § 34.*]

2. CARRIERS (§ 26*)—RATES—CONSTITUTIONAL GUARANTIES—JUST COMPENSA-
TION.

Just compensation, secured by the Constitution of the United States,
does not mean a guaranty to a carrier, as against the public, of any
fixed percentage of profit on an investment.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 67–82; Dec.
Dig. § 26.*]

3. CARRIERS (§ 34*)—FIXING OF RATES BY INTERSTATE COMMERCE COMMISSION
—REVIEW OF ORDER.

The courts cannot set aside an order of the Interstate Commerce Com-
mission requiring a reduction of rates by a railroad company on coal to
a single terminal, on the ground that its effect will be confiscatory, on
an allegation that the prior earnings of the company did not exceed 4
per cent. on the value of its property, where it is also shown that the
order affects less than one-eleventh of the freight traffic of the company,
it is admitted that the rates fixed by the Commission are not below the
cost of the service and some substantial profit, and it does not appear
whether or not its other rates are reasonable.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 91–93; Dec.
Dig. § 34.*]

Petition by the Lehigh Valley Railroad Company against the United
States, in which the Interstate Commerce Commission and Henry
E. Meeker have intervened. On motions to dismiss. Motions granted.
See, also, 190 Fed. 1023.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Frank H. Platt, of New York City, and Everett Warren, of Scranton, Pa. (E. H. Boles, of New York City, and John G. Johnson, of Philadelphia, Pa., on the brief), for petitioner.

Blackburn Esterline, Sp. Asst. Atty. Gen., for the United States.

Charles W. Needham, of Washington, D. C., for Interstate Commerce Commission.

William A. Glasgow, Jr., of Philadelphia, Pa., for Meeker.

Before KNAPP, Presiding Judge, and HUNT, CARLAND, and MACK, Associate Judges.

HUNT, Judge. The Lehigh Valley Railroad Company, petitioner herein, prays for a decree enjoining an order of the Interstate Commerce Commission. By the bill it appears that the lines of petitioner's railroad system aggregate some 1,407 miles, operated as continuous transportation routes through Pennsylvania, New York, and New Jersey; that the anthracite coal fields of Pennsylvania are divided into three groups, known as the Wyoming, Lehigh, and Schuylkill regions, located in the eastern portion of Pennsylvania; that the consumption of anthracite coal from the said coal fields is about 14,000,000 tons gross in Pennsylvania and 70,000,000 tons gross in other states; that petitioner assembles and carries annually from the above-mentioned Wyoming region about 11,000,000 gross tons of anthracite coal from collieries which are widely scattered; that it transports about 2,000,000 gross tons to petitioner's tide water terminal at Perth Amboy; that of the total freight tonnage of 25,000,000 gross tons transported annually by the petitioner, over 11,000,000 gross tons consists of anthracite coal, and that of petitioner's total annual freight revenue of $31,000,000, over $15,000,000 consists of revenue from transporting anthracite coal, and that petitioner's total revenue from the transportation of freight and passengers is approximately $36,000,000; that petitioner's prosperity and existence have been always dependent upon the business of transporting anthracite coal; that prior to October 15, 1911, it charged for services between the Wyoming region and Perth Amboy $1.55 per gross ton on prepared sizes of coal (that is, on the larger or domestic sizes), $1.40 per gross ton for a somewhat smaller size known as pea coal, $1.20 per gross ton for what is known as buckwheat coal, and $1.10 per gross ton for the finest sizes; that, as will be shown by the evidence to be offered at trial, the rates as fixed have been and will be, for more than two years hence, just and reasonable for the services performed.

It appears that on July 17, 1907, Henry E. Meeker and Caroline H. Meeker complained that the rates on anthracite coal from the Wyoming region to tide water at Perth Amboy were excessive and unreasonable, and asked the Commission to compel a reduction and to grant reparation; that the railroad company answered the complaint; that testimony was taken, and thereafter, on May 17, 1910, argument was had before the Commission; that on June 8, 1911, the Commission made its report and order, requiring this petitioner to abstain from charging the aforesaid rates on anthracite coal from

the Wyoming region to Perth Amboy, and to establish for the transportation of anthracite coal in carloads from the Wyoming to Perth Amboy rates not in excess of the following, to wit, $1.40 per gross ton on prepared sizes of said coal, $1.30 per gross ton on pea coal, and $1.15 per gross ton on buckwheat coal; that the effective date of the order of the Commission was changed from August 15 to October 15, 1911. Petitioner says that it appears from the facts set forth, and as will be fully shown by the evidence to be offered by it at the trial, that the rates prescribed in the order of the Commission are and each of them is unjust to petitioner and unreasonably low for the services performed.

It is alleged that new circumstances have required an amendment to the petition first filed in this court, and that experts and engineers were put to work to appraise the value of the petitioner's railroad system, the value thereof being a fact of chief importance in the evidence to be presented; that petitioner asked the Commission for a rehearing; but on May 28, 1912, the Commission denied such application.

Petitioner says that the value of its railroad plant as of January 1, 1912, measured by the cost of reproduction, has been ascertained to be at least $312,500,000, and that there are many other elements of value which will be shown at the trial; that a reasonable and fair return upon such value is at least 8 per cent.; that the returns from the investment in times of relative prosperity must provide, in addition to a reasonable per cent. return, an amount sufficient to cover the deficits of less prosperous years; that provision must be made out of earnings for the loss of capital invested in the railroad plant resulting from the exhaustion of the anthracite mines, which will within 10 years cause a decrease in the annual tonnage, and thereafter a gradual decrease until the coal is exhausted; that a minimum reasonable and fair annual return would be $25,000,000; that by charging the rates in effect prior to the effective date of the order and by using skill and economy petitioner cannot earn "an annual return equal to $12,500,000," which is but 4 per cent. of the minimum value, and constitutes far less than a reasonable and fair return; that if the order of the Commission is effective the earnings on the property will be reduced by more than $450,000 annually, in that many other rates on anthracite coal will have to be reduced to avoid inconsistencies and discriminations; that petitioner cannot increase its earnings from other sources to offset reductions which would have to be made; that anthracite rates east-bound and west-bound are controlled by the competition of other lines; and that the rates fixed by the order of the Commission are relatively lower than other anthracite rates of petitioner. Petitioner then sets forth that much of its other traffic is made up of the products of manufacture and other miscellaneous commodities for the most part carried under joint rates with connecting carriers; that there can be no increase in the volume of traffic and earnings on petitioner's railroad within the two-year period covered by the order of the Commission that will

not be far more than offset or absorbed by the great increase of expenses; that the petitioner's railroad was wisely and economically constructed, and that there is no excessive expense of operation; that the rates in force before the Commission made its order were so low that the traffic to which they applied moved freely and with reasonable profit to the shippers, and that the rates then in force were relatively lower than all other anthracite rates on petitioner's railroad; that the order will cause reductions in the rates on about 4,000,000 tons of petitioner's anthracite traffic, or 37 per cent. of its total anthracite traffic and 16 per cent. of its total freight traffic; that it is possible with substantial accuracy to determine whether or not the assembling, transporting, storing, and transshipping of anthracite coal may be conducted without loss under the rates fixed by the order, and that the rates so fixed are not and will not be sufficient to pay the cost of conducting the assembling, transporting, storing, and transshipping aforesaid, and a just and fair return on the value of that portion of petitioner's property used in said service; that the average revenue per gross ton for all sizes of anthracite, under the rates prescribed, is approximately $1.35; that to assemble, transport, and transship petitioner has to expend for operating expenses at least 90 cents per gross ton; that the cost per gross ton for the depreciation of the facilities so employed is at least 10 cents, leaving a balance of 35 cents, which is insufficient to pay an annual return of 6 per cent. on the value of that portion of petitioner's facilities so employed.

The bill then avers that the Commission issued its order without a full hearing as required by the act to regulate commerce; that the Commission neglected to follow the rules for judicial investigation, received improper testimony, gave undue and controlling weight to incompetent evidence, failed to consider established and undisputed testimony, and to apply the ordinary rules of a court to the competency of testimony and exhibits; that it based its decision upon certain alleged facts (which are specified in the petition under consideration) set forth in the petition filed before the Commission, which said allegations were not true; that it arbitrarily and unlawfully ignored proof, and reached its conclusion by wrongfully confusing the value of petitioner's transportation plant with the par value of petitioner's outstanding capital stock; that since the hearing was had before the Commission conditions have materially changed, wages have increased, and cost of operation has become greater; that the Commission excluded facts and circumstances that ought to have been considered, in that the Commission refused to consider the investment as evidence of the cost of assembling, transporting, storing, and transshipping and depreciation, but based its conclusion solely upon a comparison between the net earnings prior to June 30, 1908, and the par value of petitioner's outstanding capital stock.

The United States and the Interstate Commerce Commission and the intervener have moved to dismiss the petition for lack of equity.

Two principal contentions are advanced by petitioner: First, con-

fiscation; second, lack of substantial evidence before the Commission on which to rest the conclusion reached. Petitioner argues that (a) the order of the Commission compels the carrier to operate its entire plant for a return of less than 4 per cent. upon its value; and (b) that the order deprives the carrier of its right to receive for transporting tide water coal an amount sufficient to cover operating expenses, depreciation, and a reasonable compensation for the use of that portion of the facilities used in handling tide water coal.

Reducing essential facts to a narrow compass, we find that the order of the Commission affects the traffic on 165 miles out of a total of 1,407 miles of petitioner's railroad, and about 2,000,000 tons of anthracite coal out of a total anthracite coal tonnage of over 11,000,-000 tons; that the anthracite tonnage involved is four fifty-sevenths of the entire freight traffic of the petitioning road; and that the effect on the gross income of the road, which is $36,000,000, when measured by the traffic of the year prior to the making of the report of the Commission, was to make a reduction of $247,000.

The argument is that the order reduces the annual return from $12,500,000 to $12,050,000, which is less than 4 per cent. of the value of the petitioner's road, which, as stated by the petitioner, is $312,-500,000, and that the loss of income brought about by carrying out the order cannot be made up from rates on other traffic, because such other rates, so far as applicable to anthracite, are as low as they can consistently be put. The assumption is that the Commission cannot and would not approve of any increases in other anthracite rates, while rates on commodities other than coal are for the most part joint rates covering competitive traffic, which are made under such circumstances that larger divisions cannot be obtained, and that it is beyond the petitioner's power to increase materially its revenue from those sources.

[1] Petitioner says that it should not be called upon to establish its inability to make up on other traffic the losses resulting from the order in question; that it is for the respondent to meet the showing of confiscation by the petitioner by proof that the tide water rates are relatively high and that other rates are unreasonably low and should be raised in order to equalize the schedule; that as anthracite tide water rates constitute the "backbone" of petitioner's rate structure, the order is not incidental; and that its effect is not unsubstantial in its bearing upon the property rights of petitioner.

As the Commission has not established a system of rates for the petitioning carrier, it cannot be presumed to have examined the tariffs of petitioner in their entirety for the purpose of ascertaining whether its rates upon all classes of traffic are reasonable. It is individual rates, or joint rates or charges, which may be investigated by the Commission in the exercise of its powers under the act to regulate commerce, and not primarily systems of rates. Naturally, to the end that justice shall be done in the consideration of the question whether a single or individual rate is reasonable, the Commission may, among other things, consider the reports of the finances of the car-

rier whose rates are the subject of investigation, may inquire into such reports and the items thereof, into circumstances of management, the carrier's present and prospective business, operating expenses, outstanding obligations, and interest charges, whether the rate under examination appears to be disproportionately or unreasonably high, and whether all traffic appears to bear a proper share of expenses and profits. But the power of determination being confined to the matter of a single rate, when the complaint is as to the injustice of such rate, if it is found that such individual rate is unreasonable, the carrier, which seeks to set aside the order of the Commission reducing such rate upon the ground that the effect of the order will be to confiscate its property by reducing its total revenues to a point where it cannot earn more than a given per cent. upon the alleged total value of its road, is not aided by a presumption in favor of the reasonableness of the many rates which are not under direct investigation which is strong enough to overthrow substantial evidence to the effect that the individual rate under investigation is unreasonable in itself.

Let it be assumed that where a system of rates has been established by legislative authority, and an attack is made upon such entire system in a manner to present the question whether such tariff as a whole operates to confiscate the property of the carrier, the courts are empowered to inquire whether all classes of traffic are charged relatively reasonable rates or are justly classified, whether the body of rates prescribed is such as "to work a practical destruction to rights of property," and, if it be found that such system is unjust and unreasonable to such extent, to restrain its operation. Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014. Such cases have generally arisen where state authorities have fixed systems of rates. Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; St. Louis & S. F. R. v. Gill, 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567; Minneapolis & St. Louis R. Co. v. Minnesota, 186 U. S. 257, 22 Sup. Ct. 900, 46 L. Ed. 1151. Let it be assumed, too, that where a carrier's business is such that the effect of a reduction of a single rate (for example, where 90 per cent. of the business of the road is the carriage of a single commodity) will clearly operate to deprive the carrier of any compensation by way of profit the courts will interfere. But where the tariffs are constructed by the carrier and, after full hearing, an individual rate is found to be unreasonable, and an order is made by the Commission which reduces such individual rate merely to a point where such reduction will reduce the total income of the carrier to 4 per cent. approximately, the carrier has no case of confiscation prima facie, but must prove that its rates other than the one involved in the order are in fact reasonably high and cannot be advanced above the point fixed by the tariffs it has filed. It is not for the courts to say under such circumstances what are reasonable rates between two points upon a railroad line, for to do so would be to substitute judicial judgment for that of the tribunal to which the determination of such matters is committed.

[2, 3] Nor can the courts lay down any general rule as to what shall

constitute confiscation with reference to railroad rates, where the facts, as in this case, show a profit of approximately 4 per cent. The just compensation secured by the Constitution does not mean a guaranty to a carrier as against the public of any fixed percentage of profit upon an investment.

Application of these views is very just when the carrier relies upon inadequacy and unreasonableness of individual rates on a particular traffic for a past time, alleging that the rates upon the whole system as affected by the single reduction will not yield a sufficient profit in the future. Illustration is afforded by the case at hand. Petitioner shows that the revenue from its coal traffic, or $15,000,000, is approximately 47 per cent. of the revenue from its total freight traffic, or $31,000,000. The total anthracite coal tonnage, or 11,000,000 tons, thus represents 47 per cent. of the gross earnings of the road; and inasmuch as but 2,000,000 tons of anthracite are affected by this order, it becomes evident that the order of the Commission affects only two-elevenths of 47 per cent. of the total revenues of the road, or two-elevenths of $15,000,000, representing the revenue derived from coal traffic.

At once the inquiry arises whether the rates upon the balance of the traffic of the road are reasonable, and whether the proportion of the petitioner's other earnings, the 53 per cent., is bearing its fair share of the expenses of the road. How can a court say that the reduction of the particular rate complained of to a point admittedly not below cost of service and some substantial profit is confiscatory merely because it will reduce the gross income? Investigation into the proportions borne by other rates would have to be made to arrive at a just conclusion. Surely if the carrier is charging more than a reasonable rate on the particular traffic, coal, yet is not earning a sufficient amount on the balance of its traffic to yield an income, investigation should be had into the rates on other traffic, to see if they are too low or based upon considerations not properly regarded.

In Minneapolis & St. Louis R. Co. v. Minnesota, 186 U. S. 257, 22 Sup. Ct. 900, 46 L. Ed. 1151, the court recognized that in the general supervising of rates upon classes of freight the Commission is not bound to reduce the rates upon all classes, which may perhaps be reasonable except as applied to a particular article, and said that if—

"upon examining the tariffs of a certain road the Commission is of opinion that the rate upon a particular article, or class of freight, is disproportionately or unreasonably high, it may reduce such rate, notwithstanding that it may be impossible for the company to determine with mathematical accuracy the cost of transportation of that particular article as distinguished from all others. Obviously, such a reduction could not be shown to be unreasonable simply by proving that, if applied to all classes of freight, it would result in an unreasonably low rate."

The allegations that it is possible with substantial accuracy to determine whether or not the assembling, transporting, storing, and transshipping of anthracite coal may be conducted without loss under the rates fixed by the order of the Commission, that the rates as fixed

by the order are not and will not be sufficient to pay the cost of conducting the assembling, transporting, storing, and transshipping, "and a just or fair return upon the value of that proportion of petitioner's property used in said service," fail to state grounds for equitable relief when they are put alongside of the further allegation that the rates fixed by the Commission cover the cost of service in transporting coal from the Wyoming district to Perth Amboy, which is 90 cents per gross ton, and that the average of the rates allowed by the Commission as applied to the traffic for all sizes of anthracite coal affected is $1.35 per gross ton, with depreciation cost of 10 cents on the facilities. This is an admission that the profit left above the cost of service is sufficient to yield an annual return on the value of that portion of petitioner's facilities employed in that particular traffic, which, though less than 6 per cent. on the value—not specifically stated—of the facilities employed, is at least of such a substantial margin as to prevent a conclusion that petitioner's property is being taken without just compensation.

Other averments of the bill, to the effect that the Commission excluded and refused to consider facts and circumstances that ought to have been considered, or that the rates prescribed were fixed arbitrarily, and are not just and fair, fall when we examine the report of the Commission, which is before us, disclosing that evidence relevant to the issues which the petitioner raised herein, except those matters which it is alleged accrued since the report was made, was considered.

Turning to the report, we find reference to the endeavor on the part of the Lehigh Valley Railroad Company to show the actual cost of transporting coal from the Wyoming district to barges at Perth Amboy, with comment upon the character of testimony offered, which consisted of statements by engineers, estimates based upon operating expenses, interest, depreciation, and other facts and circumstances. The report refers to the basis used in apportioning expenses, to rates for transporting coal, to evidence concerning markets for anthracite on the lines of the Pennsylvania Railroad, and to the allowances made in connection with such transportation. The contentions of the carrier with respect to terminal expenses are adverted to, and reference is had to the privileges of stocking and storing and lifting accorded by the carrier at Perth Amboy. Nor did the Commission fail to consider the argument of the carrier that there is a limited life to railroads dependent upon anthracite coal carriage. The most careful attention appears to have been given to this point, the Commission quoting at length from the report of the Anthracite Coal Strike Commission rendered to the President of the United States on March 18, 1903, wherein the opinion was expressed that anthracite coal mining would continue for a period of over 200 years. The Commission also noticed the claim of the carrier with respect to its right to earn enough out of its coal rates to provide for a return of the principal of the investment in that part of the railroad devoted to the carriage of coal when and as the principal would become reduced by exhaustion of the coal supply, and it was expressly found that the rates were more than

204 F.—63

sufficient to meet the contention that there should be an annual income sufficient to provide for a return of the capital when that part of the railroad devoted to the carriage of anthracite would lose its earning capacity through the depletion of the supply of coal. The Commission, however, regarded that as "too speculative to be of much value in determining the reasonableness of present rates," inasmuch as, when anthracite coal would be exhausted, other traffic might be so dense as not to impair the present earnings of the road. The report then advances to the further arguments of the carrier that the rates on coal must be sufficient to produce (1) income enough to make up for past deficiencies in return upon investment; (2) a reasonable current annual return upon the investment in the railroad and transportation adjuncts; (3) an amount sufficient to provide for keeping up the property to modern standard; and (4) an amount sufficient to provide for a return of the principal of the investment when and as the principal becomes reduced and extinguished by the exhaustion of coal freight. Each of these several propositions was dwelt upon by the Commission, and with painstaking care the various aspects of the financial condition of the Lehigh Valley Railroad were presented and analyzed. The estimated cost of transporting a ton of coal from the Wyoming region to Perth Amboy as made by the engineers of the Lehigh Valley Railroad was considered, and the Commission said in part:

"Turning again to the Wilgus exhibit, we find the estimated cost of transporting a ton of coal from the Wyoming region to Perth Amboy is $1.49. But we have shown that 10 cents of that amount, designed to cover past deficits, is an improper charge. Therefore $1.39 would be the cost if the exhibit were accurately and properly constructed on the basis of the facts known to the witnesses. In considering this exhibit it must be remembered that the so-called cost does not mean operating expense. The item of $1.49 is designed to cover all proper, possible, and probable charges, including not only interest and depreciation charges, but other items, such as the 10-cent allowance above mentioned. Therefore, if the exhibit were not open to objection, it would be seen that, after eliminating the 10-cent charge above referred to, defendant's rates on the several sizes of anthracite coal ought to bring them revenue averaging $1.39 per gross ton; that is to say, upon defendant's own showing it is collecting rates which have been on the average 7 cents per ton in excess of a reasonable rate."

In the light of all the facts and circumstances stated, the allegation in the bill that there was no "substantial evidence" to sustain the order of the Commission, and that the order was made by the Commission "without any substantial evidence to warrant the conclusion reached," or the reasons assigned by the Commission for its conclusion, becomes not a challenge of the truth of the report to the effect that there was evidence introduced in support of those matters which were material to the inquiry had, and to which the evidence was given, but only states that the evidence heard was not substantial or so substantial as to justify the conclusion reached. As such evidence, however, was proper to be considered, and bore directly on the issues, it was both relevant and pertinent to the essential features of the inquiry.

The averment that "the Commission, in fixing said order, acted arbitrarily and unjustly, contrary to the evidence, and without evidence to support its conclusions" must be disregarded in the light of the history of the case as detailed by the bill itself, showing that the Commission proceeded regularly to a hearing and that it acted after the introduction of much testimony, apparently properly introduced and competent in its bearing upon the questions involved at the hearing. That the Commission acted contrary to the evidence is negatived by those parts of the bill which set forth what evidence was before the Commission concerning its financial affairs, its railroad system, returns, and other matters. The averment that the Commission acted without evidence to support its conclusions falls when the bill is considered as a whole, for the reason that it appears therefrom that there was introduced before the Commission proof of the amount of money invested in petitioner's railroad plant, together with evidence concerning the returns on the investment, evidence in detail of petitioner's revenues and disbursements with respect to the cost of assembling, transporting, storing, and transshipping of coal, difference between net earnings prior to June 30, 1908, and the par value of petitioner's outstanding capital stock. Whether the Commission gave much or little weight to such evidence, or regarded it as controlling in arriving at a result, is immaterial, provided the action of the Commission was not in disregard of law.

These views dispose of the more important features of the case. We have given careful attention to the briefs and arguments made by counsel, but do not find any well-founded reason for interference with the action of the Commission.

The motions to dismiss are granted.