## FACILITIES FOR INTERCHANGE OF TRAFFIC.

Common Pleas Court of Franklin County.

THE PENNSYLVANIA COMPANY ET AL V. THE PUBLIC SERVICE
COMMISSION OF OHIO ET AL.

Decided, May, 1913.

*Railways—Control of, by Public Service Commission—Authority to Require the Putting in of Connection Tracks—Such an Order Not Unreasonable, When—Constitutional Rights and Due Process of Law as Applied to Orders Requiring Expenditures by Railways—Sections 522 and 614-42.*

1. The paramount purpose and design of the Public Service Commission law passed by the Legislature in the exercise of the police power was to regulate the public duties of public utilities not within the jurisdiction of courts. The latter has power to interfere with regulatory acts of the commission only when such corporate public utility is deprived of its property without due process of law, or its property is taken without just compensation. Because of the varying quantity of police power its scope is differently interpreted than are other specific constitutional provisions. Being the expression of social and economic conditions, courts when called upon to review such legislative acts must search for principles of constitutional morality from new and various experiences of present times and existing circumstances, because such power is limited only by public need, and the prevailing morality and strong and preponderant public opinion, from its nature incapable of exact definitions. Courts must therefore apply the same rule of opinion in judicial expression in determining whether a Legislature has deprived a person of his property unlawfully. Due process and police power should parallel each other in their lines of morality; and if the legislative act shall be found upon an analysis not to deprive one of his property in a way contrary to common standards of justice, it shall be deemed to come within the police power, and hence it will not violate the "due process" clause.

2. An order by the State Public Service Commission requiring three railway companies, whose tracks intersect in the city of Wooster, to put in transfer or connecting tracks, at a total cost of about $14,000; in order to accomodate certain manufacturers and others whose traffic amounts to about two thousand cars per year, is not so unreasonable in its requirement of additional expenditure as to

violate a constitutional right by taking the property of said companies without due process of law.

3. Sections 522 and 614-42, General Code, furnish ample warrant to the Public Service Commission for requiring of railways the installation of proper facilities for the interchange of traffic. .

*Henderson, Livesay & Burr,* for plaintiffs.

*Timothy S. Hogan,* Attorney-General,. and *Durban & King,* contra.

KINKEAD, J.

The plaintiff complains that on the 18th of September, 1912, the public service commission, upon complaint and investigation, made a finding and order requiring that in the future the plaintiff shall construct and maintain a transfer or connecting track between the respective tracks of plaintiff and defendant companies in a suitable place in or near the municipality of Wooster, that will enable each of the railroad companies—the plaintiff and defendant companies herein—to deliver to the other, cars, either empty or loaded, or both empty and loaded, in order that such cars may be switched or transferred and transported in road haul to the desired and designated destination, and in order that cars bearing incoming freight may be properly placed for unloading; that the transfer and connecting tracks be so located, constructed and maintained as to admit of the passage of cars, with facility, from the rails, track and road of each of said defendant companies to the rails, tracks and road of each of the other defendant companies.

The plaintiff companies are dissatisfied with the order so made and by this action seek to have the same vacated and set aside, and have the public service commission perpetually enjoined from bringing any suit, action, or prosecution against plaintiffs, the object or purpose of which may be to put the order into effect, for the reasons, and on the grounds following:

(1) The order was without authority, statutory or otherwise; hence, the commission was without jurisdiction.

(2) The order is void for indefiniteness.

(3) The same was made without proper consideration of the places and persons interested, or the volume of business.

(4)   It was not justified by a public necessity.

(5)   It was against the weight of the evidence.

(6)   It will require an expenditure of money without adequote return.

(7)   It will deprive plaintiffs of their property without due process of law, and it will be a taking of property for public use without just compensation, contrary to the Constitution of the United States and of Ohio.

The public service commission answers, admitting the order but in effect questions the legal sufficiency of the claims asserted by plaintiffs.

The complainants before the commission were the Canton-Hughes Pump Company and others. They complain that the railroad companies wholly failed to furnish proper facilities for the interchange of traffic between their lines, and for forwarding and delivering freight and property; that they wholly failed to provide switching facilities and tracks necessary for transferring and delivering car load lots and empty cars for loading freight. The evidence discloses that there are a number of business concerns in the city of Wooster interested in the interchange of traffic, some of them located on the B. & O. Railroad Co., and some on the Pennsylvania road. Such concerns can not as conveniently ship or receive car load lots on the road on which they are located. The railroads were of equal gauge and pass into and through Wooster, the tracks of each crossing the other in or near the municipality. The commission found that the business conducted by the complainants, as well as that of other persons, is located contiguous and near to the tracks. The order was that the "defendant companies" construct and maintain the transfer and connecting track between the tracks of the companies. But only the Pennsylvania Company prosecutes this action. Section 543 of the Public Service Commission Act permits a railroad company, if dissatisfied with an order of the commission, to institute an action in court against the commission to vacate and set aside an order made when the regulation, practice or service fixed is *unlawful* or *unreasonable*.

Such provision and remedy is essential to the validity of the enactment in order not to give the commission final power, so

as to avoid and prevent it from making orders affecting rights which are within the exclusive domain of the co-ordinate judicial branch of government. Such rights are those, the power to adjudge which, is given by the common law, written constitutions, and statutes. In considering the respective powers and duties of the commission and of courts concerning such matters as come within the purview of the enactment, it is essential to distinguish between common law and constitutional right and regulations so as to avoid confusion of thought. The former railroad commission law was called in question because it was claimed to infringe upon the Constitution by conferring judicial power upon the commission, which, of course, may not be done. In upholding its validity in *Railroad* v. *Railroad Commission,* 10 N.P.(N.S.), 665, 669, we endeavored to point out the lines of demarcation between judicial power, and that conferred upon executive or administrative bodies merely to ascertain, hear and decide questions of fact, apply the rule of the statute thereto, and enforce the same. See also *France* v. *State,* 57 O. S., 17.

But there is now need of further elucidation to clearly perceive the purpose of the law, both as to the duties of the court and of the commission.

The design of the enactment being executive or administrative in character, it having been passed by the legislative branch of government in the exercise of the reserved police power, the paramount purpose was to regulate the public duties of railroad corporations as *quasi*-public utilities. There was no intent to empower the commission to hear and settle private controversies between individuals and railroad companies, nor to usurp the function of courts by entertaining legal inquiries concerning the exercise of corporate franchises. It has been appropriately observed by our court of highest resort that at common law the courts would be without power to make orders such as are made by railroad commissioners, like ordering that equal and reasonable facilities be afforded for the interchange of cars and traffic between intersecting lines. Legislative authority to do these things is essential, the court stated (*Wisconsin Rd. Company* v. *Jacobson,* 179 U. S., 287). And the legislation we now have before us commits to the commission executive or administrative

powers and duties only, and to courts such judicial power and duties as is already conferred by the Constitution. This is done to guard against an unlawful application of a rule or regulation prescribed by the enactment to facts and conditions in such manner and under such circumstances as may infringe upon or violate the right of property protected by the Constitution.

This law being the product of the reserved police power of the state, the power of the courts to interfere with regulatory acts imposed by the commission in pursuance thereof, is limited to violations of specific guaranties of the Constitution, namely, that no person shall be deprived of his property without due process of law, or that it shall not be taken for public use without just compensation.

Because police power is a varying quantity; and because what constitutes a taking of property without just compensation, or a deprivation thereof without due process of law, is also of like nature—depending as it does upon particular facts, circumstances and conditions, and the application of the particular view or opinion—the result is a fruitful field for controversy.

For these reasons the scope of police power is to be differently interpreted than that of other specific constitutional questions. So, the power of courts respecting such matters of regulation in pursuance of police power, is to be viewed in different light from that concerning other specific questions of fundamental law. It would be fortunate, indeed, if the mental faculties of legislative, administrative and judicial officers of government were so attained as to produce harmony of opinion. Police power being but the expression of social, economic conditions— the characteristic principle of the common law being to draw its inspiration from every fountain of justice, so has it always been, and is now, the duty of legislatures and of courts to search for principles of constitutional morality from new and various experiences of present times and existing circumstances and conditions. This power being defined and limited only by the great public needs, or the interests of a community, or the prevailing morality and strong and preponderant public opinion,

a power which is and must from its nature be incapable of exact definition, as it is, therefore, always the duty of courts to apply the same rule of opinion in judicial expression in determining whether an enactment of a legislative will has or has not deprived a person of his property with out due process of law, or whether it has taken property without just compensation. See *Noble State Bank* v. *Haskell*, 219 U. S., 104, 111; *Hurtado* v. *California*, 110 U. S., 516.

The sole question to be decided in this case, therefore, is whether the act of enforcement of the regulation of the statute under the facts and conditions shown by the record is violative of the constitutional rights of the railroad company. The matters committed to the commission for the exercise of its enforcing powers in so far as they do not come within the above mentioned guaranties or other are not subject to review, or rather we may say not subject to change by courts, because it is but the application of the paramount legislative will, which is beyond the power of control by courts in such case.

Under Sections 543-547 the court must then only determine whether the order by the commission is so far unreasonable as to be in violation of the provisions of the Constitution. It is not merely to express its opinion concerning a question of reasonableness disassociated from constitutional guaranty.

There are certain definitions to be kept in mind in weighing the facts and circumstances by the measure of the constitutional guaranties: First, is *property*, thus protected against invasion unless due process is had, or just compensation be made. The great purpose of organized society is the security of property, which simply means anything which a person owns, or the free use and enjoyment by a person of all his acquisitions, without any control or diminution, save only by the law of the land. *Watson, Constitution*, 1456; *Stevens* v. *State*, 2 Ark., 291, 299.

Concerning "due process," there has been much discussion recently as if its meaning was in some doubt. There are those who regard it as a mere legal concept, having relation only to "procedure" and not to matters of the substantial justice of results reached, that it has come to include the element of just

compensation only by a process of judicial amendment to the Constitution; that property shall not be taken, except by procedure in accordance with the fairness and regularity of Anglo-Saxon jurisdiction, upon notice and a hearing; that the original purpose was alone to prevent the legislative branch of government, from arbitrarily seizing property without legislative act, or notice, or hearing; that property shall not be taken by legislative act which violates fundamental ideas of justice.

We believe that "due process" and "police power" should parallel each other in their lines of morality and justice, that if any legislative act not in conflict with some specific constitutional prohibition, shall be found upon analysis not to deprive one of his property in a way contrary to common standards of justice, it shall be deemed to come within the police power, and, hence, it will not violate the "due process" clause. But due process without considering the results attained thereby is not all there is in the legal conception. There must be, it is true, some method of procedure provided to ascertain the facts and apply the regulation, but courts may not be deprived of final authority to maintain the supremacy of constitutional rights. The morality and justice maintained by expression of the police power, and by the judiciary, ought to meet the same required standard, but being the offspring of human endeavor, either is liable to err. So in this case the question is whether the legislative agency—the commission—has erred in ordering property taken for public use without due process of just compensation. If it has, the court has a duty to perform; otherwise, it may do nothing more than dismiss the action.

Due process means not alone the orderly course of procedure in accordance with the fundamental ideas of fairness and regularity obtaining in Angle-Saxon jurisdiction, involving due notice, and opportunity to be heard, and some regularity, of course, of action, but it means as well that the order made by an administrative or executive body enforcing the legislative regulations shall not so unreasonably do so as to take property for public use without just compensation. Furthermore, an order made by such a body requiring a railroad company to expend money

and use its property in a specified manner is a taking of property, and to be valid there must be more than mere notice and opportunity to be heard; the order itself must be justified by public necessity, and not unreasonable or arbitrary.   *State, ex rel,* v. *Railroad Commissioners,* 224 U. S., 510.

Administrative process of a customary sort is as much due process of law as judicial process (*Cooley, Const. Lim.,* p. 214; *Watson, Const.,* 1452).   Executive orders may also be due process of law (*Public Clearing House* v. *Coyne,* 194 U. S., 497, 508).   Due process is designed to afford opportunity for a hearing for the purpose of fully developing the facts, so that public necessity must be determined, and just compensation may be awarded for property taken.

In *State, ex rel,* v. *Railroad Commissioners,* 224 U. S., 510, the Washington Railroad Commission law authorized a hearing of a complaint for additional trackage and connections.   A hearing was had at which evidence on both sides was offered.   An order was made requiring a track connection.   Proceedings were had in the state courts under a statute requiring it to be heard on the same evidence taken before the commission.   The cost was put at from $316 to $1,460 and aggregating about $7,000 by the evidence taken before the commission.   Evidence was offered in the trial to the court that instead the cost would be $21,000 besides expenses for acquiring land.   The evidence could not be received under the statute, but the court was not bound by the order made by the commission.   The record failed to show what, if any, business would be routed over the connections, or what saving would came to the public.   There was nothing by which to compare the advantage to the public with the expense to the defendant and nothing to show such public necessity within the meaning of the law as to justify the taking of the property.   So the judgment was reversed, because the regulation was unreasonable.

The power of a state, acting through an administrative body, to require competing railroad companies to make track connection under proper conditions and circumstances was recognized in *Wisconsin Rd. Co.* v. *Jacobson,* 179 U. S., 287.   It ap-

peared in that case that on one of the lines there was an immense supply of wood, for which there was a great demand at points on the other, where there was none, and that if the connecting track was installed there would be a saving in time and freight on this large volume of business. It also appeared that many cattle were raised on one line, for which there were important markets on the other, and that without the track connection these cattle would have to be hauled over a much longer route, with a resulting loss in weight and value. The advantage to the public was so great that the order requiring track connection was sustained, in spite of the fact that one of the roads was thereby deprived of the revenue which it would otherwise receive for the longer haul.

. In considering the evidence taken before the commission as to the connection in question, in the case at bar, looking to the population of the locality and the varied business interests, whose convenience and needs will be greatly subserved by the interchange of trackage, we consider the order from the point of view of the requirements of the public interests as one coming clearly within the scope of the power to enforce just and reasonable regulation. There is located on the Pennsylvania line a manufacturer of large water works pumps, difficult to ship, except by loading directly on the cars. It has an incoming traffic of about three thousand tons of brass and other items of probably one thousand tons, and has need of getting shipment of materials and supplies over the other road; there is also a lumber company shipping eight to ten carloads of finished products per month, which would have better facilities with the interchange of traffic; also a coal company which receives 412 cars per year, and which could have a greater open market with the switching facility.

On the B. & O. Railroad line is located a milling establishment, contemplating a new mill if the switch be installed, having now an output of eighty thousand bushels of grain per year, an inbound of eighty-six carloads in six months, and an outbound in full carloads of forty-five. An interchange of cars would dispense with much hauling. There is also located on the B. &

O. another dealer in coal and builder's supplies which receives 280 cars per year and is without as good facilities for getting coal and material; also on same road is a brick company with capacity of 20,000 paving brick, and five to ten thousand wire cuts daily, with 350 to 550 cars out and 100 to 200 cars of coal in; also a sand handling machinery and molding sand concern with plant one mile south of the city.

The testimony does not undertake to show how much proportionate advantage there may be either to the companies mentioned or to the railroad companies. That would involve speculation, but from the facts produced it appears that the track connection would be of great mutual benefit to both as well as the public. It appears from the testimony of the witnesses on both sides that the chief controversy is concerning the cost of the improvement. The railroad companies were willing to make the improvement but for the cost. The estimated cost for scheme No. 1 is $5,400, exclusive of land; for scheme No. 2, $3,100, exclusive of land; for scheme No. 3, $5,370, exclusive of land. Land belonging to the Pennsylvania could be used, it appears, for one of the schemes. The expense is to be divided between the two companies. The B. & O. Railroad Company is evidently satisfied, for it is not prosecuting this action.

The public necessity being made clear, the only question is the one of cost. Does the mere matter of cost have such controlling effect as to make the regulation a taking without just compensation? We think not. The distinction is made clear between a regulation by a general scheme of regulation as to rates which will produce an adequate return for the operation of a railroad as an entirety, and one where the question is as to the validity of an order to do a particular act, the doing of which does not necessarily involve the question of profitableness of the operation of the railroad as a whole (*St. L., etc., Ry.* v. *Gill,* 156 U. S., 649; *Minn. & St. L. R. R. Co.* v. *Minnesota,* 186 U. S., 257; *Smyth* v. *Ames,* 169 U. S., 526). A regulation concerned only with an order directing a carrier to furnish a facility which is part of its general duty to furnish for the public convenience, may well be compelled although by doing so as an incident some

pecuniary loss from rendering such service may result. It follows that the mere incurring of a loss from the performance of such duty does not in and of itself necessarily give rise to the conclusion of unreasonableness, as would the case where the whole scheme of rates was unreasonable. Of course, the fact that the furnishing of a necessary facility ordered may occasion an incidental pecuniary loss is an important criteria to be taken into view in determining the reasonableness of the order, but it is not the only one. As the duty to furnish facilities is co-terminous with the powers of the corporation, the obligation to discharge that duty must be considered in connection with the nature and productiveness of the corporate business as a whole, the character of the services required, and the public need for its performance. Although to carry out the order and judgment it may require the exercise of the power of eminent domain and will also result in some, comparatively speaking, small expense, yet neither fact furnishes an answer to the application of the regulation. *Wisconsin Rd. Co.* v. *Jacobson,* 179 U., S., 302, quoted in *Atlantic Coast R. R. Co.* v. *N. C. Corp. Com.,* 206 U. S., 1, 27.

The power or right of the commission in this case to make the specific order to require the companies to construct the connecting track is questioned as a matter of construction of statute. Our conclusion is that Sections 522 and 614-42 furnish ample warrant for the exercise of such power. By these two provisions steam railroad companies are required to afford reasonable and proper facilities for interchange of traffic between their respective lines. The fact that Section 614-42 authorizes the commission to hear a complaint against any road or roads that neglects or refuses to make a connection clearly shows that the provisions of that section are mandatory, that *may* means *shall.*

The conclusion is that the regulation is not so unreasonable as to be in violation of constitutional right, and the action is, therefore, dismissed.